J-A19029-18

2019 PA Super 27

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| v. | : | |
| GERALD A. SANDUSKY | : | |
| Appellant | : | No. 1654 MDA 2017 |

Appeal from the PCRA Order Entered October 18, 2017
In the Court of Common Pleas of Centre County Criminal Division at
No(s): CP-14-CR-0002421-2011,
CP-14-CR-0002422-2011

BEFORE: GANTMAN, P.J., NICHOLS, J., and FORD ELLIOTT, P.J.E.

OPINION BY NICHOLS, J.: **FILED FEBRUARY 05, 2019**

Appellant Gerald A. Sandusky appeals from the order denying his timely first petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S. §§ 9541-9546. Appellant raises a number of claims relating to the ineffective assistance of counsel, violations of **Brady v. Maryland**, 383 U.S. 83 (1963), and newly discovered evidence. He also challenges the legality of his sentence. We affirm in part and remand for resentencing consistent with this opinion.

We briefly summarize the relevant procedural history of this case. On November 4, 2011, after the Thirty-Third Statewide Investigating Grand Jury issued a recommendation and presentment, the Commonwealth[1] charged

---

[1] The Office of the Attorney General (OAG) charged and prosecuted Appellant. At trial, the Commonwealth was represented by Deputy Attorneys General Joseph E. McGettigan and Frank G. Fina.

Appellant with committing numerous sexual offenses against eight young males referred to as Victims 1 through 8 in case number 2422-2011. Appellant was arrested and subsequently released on bail. Appellant obtained private counsel, Joseph E. Amendola, Esq.[2]

On December 7, 2011, after the Thirty-Third Statewide Investigating Grand Jury issued another presentment, the Commonwealth charged Appellant with crimes committed against two additional victims, referred to as Victims 9 and 10 in case number 2421-2011. On December 13, 2011, Appellant waived preliminary hearings in both cases. The matter was held over to the Centre County Court of Common Pleas, and the Honorable John M. Cleland was specially appointed to preside.

Following a contentious discovery process, during which Appellant's trial counsel sought numerous continuances and sought to withdraw from representation, Appellant proceeded to a jury trial.[3] On June 22, 2012, the jury found Appellant guilty of forty-five counts relating to the ten victims between 1995 and 2008.

_____

[2] Karl L. Rominger, Esq., entered his appearance as Appellant's co-counsel on April 5, 2012. We refer to Attorney Amendola and Rominger collectively as trial counsel.

[3] At trial, many of the victims testified against Appellant, including A.F. (Victim 1), J.S. (Victim 3), B.H. (Victim 4), M.K. (Victim 5), Z.K. (Victim 6), D.S. (Victim 7), S.P. (Victim 9), and R.R. (Victim 10). Victims 2 and 8 were unidentified at the time of trial. As noted below, Appellant contends that Victim 2 was identified as A.M.

On October 9, 2012, the trial court determined Appellant was a sexually violent predator and sentenced him to an aggregate term of thirty to sixty years' imprisonment.[4]  Appellant filed post-sentence motions, and on October 18, 2012, Norris E. Gelman, Esq., entered his appearance as co-counsel for post-sentence proceedings.  The trial court denied Appellant's post-sentence motions following a hearing at which Attorney Amendola testified.[5]

Appellant, who was then represented by Attorney Gelman, took a direct appeal.  This Court affirmed the judgment of sentence, and the Pennsylvania Supreme Court denied Appellant's petition for allowance of appeal.  ***See Commonwealth v. Sandusky***, 77 A.3d 663, 667 (Pa. Super. 2013), *appeal denied* 835 & 836 MAL 2013 (Pa. filed Apr. 2, 2014).

On April 2, 2015, Appellant timely filed his first counseled PCRA petition, raising fifteen claims of ineffective assistance of counsel.  ***See*** PCRA Pet.,

---

[4] The trial court, in structuring the aggregate sentence, imposed consecutive sentences of ten to twenty years' imprisonment each for Count 1 (involuntary deviate sexual intercourse (IDSI, Victim 9) at CR-2421-2011 and Count 1 (IDSI, Victim 1) at CR-2422-2011, and five to ten years' imprisonment each for Count 7 (IDSI, Victim 10) of CR-2421-2011 and Count 17 (IDSI, Victim 4) of CR-2421-2011.  The four counts on which the trial court sentenced consecutively involved charges under 18 Pa.C.S. § 3123(a)(7).  The remaining sentences were ordered to run concurrently.

At the time of sentencing, the trial court stated that it sentenced concurrently on counts 36 to 40 of CR-2422-2011, relating to Victim 8, and stated "if those convictions should happen to be set aside on appeal, it will make no difference to the sentence structure as a whole."  N.T., 10/9/12, at 57.

[5] As noted below, Attorney Amendola testified at the post-sentence hearing regarding the denials of trial counsels' motions for continuances.

4/2/15, at 15-95. Appellant filed an amended petition on May 6, 2015, raising additional claims. **See** Am. PCRA Pet., 5/6/15, at 15-105. On March 7, 2016, Appellant filed a second amended petition. **See** Second Amended PCRA Pet., 3/7/16, at 33-155.

Thereafter, the PCRA court conducted six separate evidentiary hearings under two different judges.[6] During these hearings, which took place between August 12, 2016 and May 11, 2017, Appellant presented several witnesses and testified on his own behalf. At the conclusion of the hearings, both parties submitted proposed findings of fact and conclusions of law.

On October 18, 2017, the PCRA court issued an opinion and order denying Appellant's PCRA petition. Appellant filed a timely notice of appeal and a court-ordered Pa.R.A.P. 1925(b) statement.

On appeal, Appellant raises twenty-two issues for review. **See** Appellant's Brief at 5-9. We list and consider each question below.[7]

Initially, we note that our standard of review from the denial of a PCRA petition "is limited to examining whether the PCRA court's determination is supported by the evidence of record and whether it is free of legal error." **Commonwealth v. Ousley**, 21 A.3d 1238, 1242 (Pa. Super. 2011) (citation

---

[6] The Honorable John M. Cleland presided at trial and through part of the PCRA proceeding but ultimately recused himself on November 21, 2016. The Honorable John H. Foradora, President Judge of the Jefferson County Court of Common Pleas, was thereafter appointed to preside over the PCRA proceedings and conducted two evidentiary hearings.

[7] We will address Appellant's issues in a different order than presented in his brief.

omitted). "The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions." ***Commonwealth v. Mitchell***, 105 A.3d 1257, 1265 (Pa. 2014) (citation omitted).

Furthermore, to establish a claim of ineffective assistance of counsel, a defendant "must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." ***Commonwealth v. Turetsky***, 925 A.2d 876, 880 (Pa. Super. 2007) (citation omitted). The burden is on the defendant to prove all three of the following prongs: "(1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different." ***Id.*** (citation omitted).

We have explained that

[a] claim has arguable merit where the factual averments, if accurate, could establish cause for relief. ***See Commonwealth v. Jones***, . . . 876 A.2d 380, 385 ([Pa.] 2005) ("if a petitioner raises allegations, which, even if accepted as true, do not establish the underlying claim . . . , he or she will have failed to establish the arguable merit prong related to the claim"). Whether the facts rise to the level of arguable merit is a legal determination.

The test for deciding whether counsel had a reasonable basis for his action or inaction is whether no competent counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success. Counsel's decisions will be considered reasonable if they

- 5 -

effectuated his client's interests. We do not employ a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken.

Prejudice is established if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Commonwealth v. Stewart*, 84 A.3d 701, 707 (Pa. Super. 2013) (some internal quotations and citations omitted).

"[B]oilerplate allegations and bald assertions of no reasonable basis and/or ensuing prejudice cannot satisfy a petitioner's burden to prove that counsel was ineffective." *Commonwealth v. Paddy*, 15 A.3d 431, 443 (Pa. 2011). Moreover, "[a] failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness." *Commonwealth v. Daniels*, 963 A.2d 409, 419 (Pa. 2009) (citation omitted).

**1. Did the [PCRA] court err in finding counsel performed effectively in permitting [Appellant] to be interviewed by Bob Costas without adequately advising him and preparing him for the interview and thereby providing the Commonwealth with additional evidence?**

Appellant's first issue relates to Appellant's nationally broadcasted telephone interview with Bob Costas on November 14, 2011, shortly after his arrest. During the interview, Costas confronted Appellant with the pre-trial statements from Michael McQueary, James Calhoun, and Ronald Petrosky

- 6 -

implicating Appellant in the abuse of two separate children.[8]  With respect to McQueary's statement regarding a February 2001 incident in the Lasch Building involving Victim 2, Appellant responded that it was false and explained that he was engaged in horseplay with that child while in the shower.  Additionally, when Costas asked what motive McQueary, Calhoun, and Petrosky would have to implicate Appellant, Appellant responded, "You would have to ask [them]."  Commonwealth's Ex. 104 at 2 (unpaginated).

Of particular relevance to Appellant's first issue, Costas asked Appellant, "Are you sexually attracted to young boys, to underage boys?"  *Id.* at 3.  Appellant paused and repeated the question back to Costas.  *Id.*  Appellant then replied, "[S]exually attracted, you know, I enjoy young people.  I love to be around them.  I, I, but no, I'm not sexually attracted to young boys."  *Id.*

In his first issue, Appellant argues that the PCRA court erred in rejecting his claim that Attorney Amendola was ineffective for permitting Appellant to participate in the interview with Costas.  Appellant's Brief at 22.  Specifically, Appellant alleges that Attorney Amendola did not adequately prepare him for

_____

[8] By way of further background, Michael McQueary, then a graduate assistant with the Penn State football team, implicated Appellant in a February 2001 assault of Victim 2.  James Calhoun and Ronald Petrosky were janitors who, in the fall of 2000, discussed seeing Appellant with Victim 8.  The incidents involving Victim 2 and Victim 8 both occurred in a shower in the Lasch Building on Penn State University's campus.  As discussed below, McQueary and Petrosky testified at trial.  The Commonwealth, over trial counsels' objections, admitted Calhoun's 2000 statements to Petrosky regarding Victim 8 as an excited utterance.

the interview and failed to advise Appellant that his statements during the interview could be used at trial. ***Id.*** at 29.

Appellant further contends that Attorney Amendola had no reasonable legal basis for advising Appellant to participate in the interview. ***Id.*** at 30. He asserts that Attorney Amendola's "encouraging of [Appellant] to waive his right to remain silent and speak to Costas had no strategic trial basis[,] as it was based on currying media attention, which is not a trial strategy." ***Id.*** at 31. Additionally, he contends that there could be no "reasonable basis for permitting your client to do a national interview without preparation." ***Id.*** at 30.

Appellant also argues that he suffered prejudice because the Commonwealth played the interview at trial and "inaccurately repeated the most damaging portion of the interview." ***Id.*** at 31. Additionally, Appellant asserts that the interview enabled the Commonwealth to comment on Appellant's silence, as the prosecution "repeatedly referenced [Appellant's] failure to tell Costas the name of [Victim 2]."[9] ***Id.*** at 32. He posits that "if counsel properly advised [Appellant] about the implications of providing an interview or adequately prepared him, [Appellant] either would not have given the interview or would not have provided fodder for the Commonwealth to use to imply that he was a sexual predator." ***Id.*** at 32.

---

[9] We discuss Appellant's separate claim based on the Commonwealth's references to the Costas interview during closing arguments in greater detail in issue two.

The Commonwealth argues that the PCRA court properly rejected Appellant's "self-serving account" of his decision to participate in the interview with Costas. Commonwealth's Brief at 35. Specifically, the Commonwealth points to the PCRA court's finding that rejected Appellant's testimony that he was not prepared for the interview. *Id.* at 29. Additionally, the Commonwealth asserts that Appellant's poor performance in the interview "had nothing to do with lack of preparation, poor advice or an ill-conceived strategy of counsel." *Id.* at 36. Given the unique circumstances of Appellant's case, the Commonwealth argues that Attorney Amendola employed a "clear, simple strategy" which "he never expected to be problematic in light of [Appellant's] consistent narrative of innocence." *Id.* at 35.

The PCRA court, in rejecting Appellant's claim, explained:

As much as he would like to pretend otherwise, [Appellant] did not go into the interview as a legal novice obsequiously following [Attorney Amendola]'s directives with no idea about what Costas might ask or how he should respond. On the contrary, [Appellant] wanted to publish his story; he wanted Costas's program to be the first medium through which it was delivered; and he was not a man who subjugated his own will to the preferences and advice of counsel.

Not comfortable with the idea of being his own spokesperson, [Appellant] initially elected [Attorney] Amendola to speak on his behalf, and that was the plan until shortly before the interview commenced. During the hour leading up to the interview, however, [Amendola] and [Appellant] discussed the public's overwhelmingly negative perception of [Appellant] and the consequent value of him personally proclaiming his innocence to the nation, and [Appellant] ultimately agreed to be the interviewee.

Because Costas would not divulge what questions he might ask, [Attorney] Amendola could not feed his client any specific

answers. Having spent more than two years defending [Appellant] against allegations of sexual abuse, however, [Amendola] was confident about [Appellant]'s ability to assert his innocence. Thus, "[W]hat you're going to have to do is explain to Bob Costas in a brief phone conversation that you're innocent, we expect to prove your innocence at trial," seemed to Amendola to be clear and sufficient instruction.

"Assert your innocence" was not the only advice [Attorney] Amendola provided, though; he also told [Appellant] to be adamant about it and to stress that he had explanations for and defenses against all the allegations. Since long before the date of the Costas interview, moreover, Amendola had counseled [Appellant] on many occasions that anything he said to anyone other than his wife could be used against him, an admonition he had reiterated just a few days earlier. [Appellant] thus was not ignorant about what he should say or how he should say it, and [Amendola] certainly could not anticipate that the same man who had repeatedly affirmed, "I am not a child molester. I have never molested children. I love children. I've devoted half of my adulthood to helping kids," would freeze when asked whether he was sexually attracted to young boys.

PCRA Ct. Op., 10/18/17, at 10-11.

We add that Attorney Amendola testified that he represented Appellant against previous sexual abuse allegations. *See* PCRA Hr'g, 8/12/16, at 107. Attorney Amendola believed that Appellant, who had proclaimed his innocence to Attorney Amendola "many times," would be able to express his innocence during the interview with Costas. *See id.* Furthermore, Attorney Amendola testified that he thought Appellant's participation in an interview with Costas was a

golden opportunity for [Appellant] to tell the world, because [he] knew there'd be millions of watchers, that he was innocent and that he intended to prove his innocence. It was a golden opportunity with a sports journalist[,] with a sports icon to get his message out at least on a preliminary basis.

- 10 -

PCRA Hr'g, 8/12/16, at 111.  Appellant agreed.

Following our review of the record, we agree with the PCRA court that Attorney Amendola was not ineffective for advising Appellant to participate in the interview with Costas.  The PCRA court expressly rejected Appellant's arguments that he was inadequately prepared for the interview and that Attorney Amendola did not fully advise him of the possible legal ramifications of his statements to the media.  The PCRA court's findings are supported by the record, and we discern no error in the PCRA court's conclusion that Appellant's claim lacked arguable merit.[10]  **See Stewart**, 84 A.3d at 707.

> **2.** **Did the [PCRA] court err in concluding trial counsel [was] effective in not seeking a mistrial after the prosecutor improperly made multiple comments based on [Appellant]'s silence?**

Appellant next claims he was entitled to relief based on Attorney Rominger's failure to move for a mistrial based on the Commonwealth's closing argument.  By way of background to this claim, Attorney Amendola referred to the Costas interview during closing arguments as follows:

> Well, let's get back to the Costas interview.  Think about this.
> [Appellant]'s arrested.  This is going global.  This isn't restricted
> to Pennsylvania.  He has been painted as a monster, a predator.
> Administrators of Penn State and Coach Paterno have been fired.

---

[10] In light of our conclusion that the PCRA court properly found no merit to Appellant's claim that Attorney Amendola failed to prepare for or advise him of the consequences of being interviewed by Costas, we need not consider whether a post-arrest media strategy falls within the scope of constitutionally competent representation or the merits of Appellant's suggestion that the reasonableness of counsel's media strategy should be assessed differently than a "trial" strategy.  **See Daniels**, 963 A.2d 409, 419.

On November 14th, a Monday night, [Appellant] agrees to an interview with Costas. [Appellant] has been in sports all his life. He knows who Bob Costas is. He's a tough interview for any of you who have ever been involved in sports or ever watched the sports programs, when he interviews, they're tough interviews.

[Appellant] decided he wanted to tell the world he was innocent. Was he nervous? I'm nervous right now with a courtroom filled with a couple hundred people. This was national, and it was advertised that he was going to talk. He didn't have to say a word. That's his constitutional right. He agreed to that interview knowing it his [sic] going to be tough.

* * *

Folks, what more could that man say? [Appellant] went on national TV with a guy who probably was every bit as tough as [Prosecutor] McGettigan and any prosecutor could ask any tough questions. What more could he say? Costas asked tough questions. He gave tough answers. Denied he did this. Said he was innocent.

N.T., 6/21/12, at 65-66, 73.

The Commonwealth during its closing argument referred to the Costas interview as follows:

[Appellant] had wonderful opportunities to speak out and make his case. He did it in public. He spoke with Bob Costas. That's the other thing that happened to me for the first time. I had been told I'm almost as good a questioner as Bob Costas, I think, or close.

Well, he had the chance to talk to Bob Costas and make his case. What were his answers? What was his explanation? You would have to ask him? Is that an answer? Why would somebody say that to an interviewer, you would have to ask him? He didn't say he knew why he did it. He just said he saw you do it. Mike McQueary. The janitors [*i.e.*, Petrosky and Calhoun]. Well, you would have to ask them. That's an answer?

[Attorney] Amendola did I guess as good a job as possible explaining—he offered that [Appellant] has a tendency to repeat questions after they're asked. I would think that the automatic

- 12 -

response when someone asks you if you're, you know, a criminal, a pedophile, a child molester, or anything along those lines, your immediate response would be, you're crazy, no. What? Are you nuts?

Instead of, are you sexually attracted to young boys? Let me think about that for a second. Am I sexually attracted to young boys? I would say, no, or whatever it is. But that's [Attorney] Amendola's explanation that he automatically repeats question [sic]. I wouldn't know. I only heard him on TV. Only heard him on TV. So that's his explanation there. He enjoys young children.

* * *

[Appellant]'s explanation on television, is there anything else that you missed? . . . I'm not sure if there was anything—because he didn't provide you with something that could have been enormously helpful to us, could have solved many problems today. I think he's talked about this, you know, the shower incident. He didn't say and that's little Johnny, who I know now ten years later who lives around the corner. He forgot a name. He remembered the incident clearly.

Why did he remember it? I mean, he showered with a lot of boys. Why did he remember this particular incident? He remembered it because he had seen Mike McQueary and he knew this day would come. He remembered it. He remembered that day.

One thing he didn't which he could have provided to Bob Costas, he could have provided it to anybody at any time. He had the complete capacity to exonerate himself at the time and just say who was there because this is a day—remember, Mike McQueary, why remember him and not the little boy you're soaping and just being innocently cleansing to? But he didn't provide that name to anybody, ever, certainly not to Bob Costas, no. He forgot that.

N.T., 6/21/12, at 140-42, 145-46.

After the Commonwealth's closing arguments, Attorney Rominger objected to the Commonwealth's reference to Appellant's decision not to testify at trial. *Id.* at 153. However, Attorney Rominger did not move for a

mistrial. *Id.* at 158. The trial court concluded that the statements were "fair rebuttal" and that it previously "cautioned the jury again and again the defendant has no obligation to testify or present evidence in his own defense." *Id.* Thereafter, the trial court issued a cautionary instruction to the jury. *Id.* at 160.

On direct appeal, Appellant argued that "the trial court committed reversible error when it denied his objection that the prosecutor commented adversely on his choice not to testify at trial." *Sandusky*, 77 A.3d at 670. However, because trial counsel did not request a mistrial or curative instruction at trial, this Court deemed Appellant's claim waived. *See id.* at 670.

Appellant claims that the PCRA court erred in its conclusion that Attorney Rominger's failure to move for a mistrial did not warrant a new trial. In support, Appellant asserts that "[i]t is apparent and reasonable to assume that the jury interpreted the prosecutor's argument as embracing [Appellant's] failure to testify." Appellant's Brief at 46. Appellant argues that the Commonwealth violated his rights under Article 1, Section 2 of the Pennsylvania Constitution and the Fifth Amendment of the United States Constitution. *Id.* at 48. He further asserts that trial counsel had no reasonable basis for failing to move for a mistrial.

The Commonwealth contends that the prosecutor's closing argument "constituted fair rebuttal to the interpretation/explanation of the Costas interview that was set forth by [Attorney] Amendola during his closing

argument and the hypothetical questions he posed to the jury." Commonwealth's Brief at 40. The Commonwealth concludes that there was a reasonable basis for Prosecutor McGettigan's comments and he was careful not to exceed the bounds of oratorical flair. *Id.* at 42. Therefore, the Commonwealth asserts that Appellant's ineffectiveness claim lacks arguable merit. *Id.* at 44-45.

It is well settled that:

> As a general rule, any comment that the prosecuting attorney makes regarding a defendant's election not to testify is a violation of the defendant's right against self incrimination as guaranteed by the Fifth Amendment of the United States Constitution, Article I, Section 9 of the Pennsylvania Constitution and by statute, codified at 42 Pa.C.S.[] § 5941. A comment is constitutionally and statutorily forbidden if "the language used by the prosecutor is intended to create for the jury an adverse inference from the failure of the defendant to testify." This rule is not an absolute bar to any reference to a defendant's failure to testify. A remark by a prosecutor, otherwise improper, may be appropriate if it is in fair response to the argument and comment of defense counsel.

*Commonwealth v. Trivigno*, 750 A.2d 243, 248-49 (Pa. 2000) (citations omitted); *cf. Commonwealth v. Cox*, 983 A.2d 666, 688 (Pa. 2009) (noting that the Commonwealth's reference to a defendant's failure to testify is a fair response if "it is evident that the [prosecution] did not treat the defendant's silence as substantive evidence of guilt, but instead referred to the possibility of testifying as one of several opportunities which the defendant was afforded, contrary to the statement of his counsel, to explain his side of the case" (citation omitted)).

The PCRA court addressed Appellant's claim as follows:

- 15 -

In his "Opinion Addressing the Defendant's Post-Sentence Motions," filed January 30, 2013, [the trial judge] addressed the substantive issue implicated here and reiterated his earlier conclusion that [Prosecutor] McGettigan's comments were fair rebuttal to [Attorney] Amendola's closing. He further noted how he had repeatedly instructed the jury that [Appellant] had no obligation to testify and that its decision must be based solely on the evidence presented, an observation well supported by the trial record.

In his brief opening instructions, [the trial judge] defined the parties' respective burdens in clear and unequivocal terms. "The burden of proving [Appellant's] guilt is always on the prosecutor. [Appellant] does not have any responsibility to prove anything," he began. Giving substance to that admonition, he added, "He does not need to present any evidence to prove that he is not guilty. In addition, under both the United States and Pennsylvania Constitutions, he has an absolute right not to testify. If he decides not to testify, you cannot hold that fact against him or infer that he is guilty because he chooses not to testify." [The trial judge] returned to that theme after describing the procedural course the jury could expect as the trial progressed: "After the Commonwealth has presented its case," he said, "the defense may present evidence for the defendant, but, remember, the defendant has no obligation to present any evidence or to testify himself because the responsibility is always on the Commonwealth and only on the Commonwealth to prove its case beyond a reasonable doubt."

Having elected to instruct the jury before the attorneys delivered their closing statements, [the trial judge] rehearsed the same legal tenets at the outset of his final charge. He thus cautioned the jurors yet again,

> The second fundamental principle [to remember] is that under our system of criminal law the defendant is presumed to be innocent. The mere fact that he's been arrested, that he's been accused of a crime is not any evidence against him. He is assumed to be innocent throughout this trial and unless and until you conclude, based on a careful and impartial consideration of the evidence, that the Commonwealth has proved to your satisfaction that he is guilty beyond a reasonable doubt.

It's not the defendant's burden to prove he's not guilty. It is the Commonwealth that always has the burden of proving that he is guilty by establishing each and every element or fact sufficient to support the crime charged and that he has been proven guilty beyond a reasonable doubt.

The defendant, under our system of law, is not required to present any evidence or to prove anything in his own defense. The Commonwealth has the burden of proving the defendant's guilt.

[The trial judge] made numerous additional references to the Commonwealth's absolute burden throughout his closing instructions. After considering defense counsel's objection to [Prosecutor] McGettigan's alleged references to [Appellant's] post-arrest silence, moreover, [the trial judge] reminded the jury one last time, "You must decide those charges based on the evidence presented here in this courtroom and be reminded that the burden is on the Commonwealth to prove its case beyond a reasonable doubt and that the defendant has no obligation at any time to present any evidence in his own defense." Even if the jurors understood McGettigan's comments as references to [Appellant's] silence, then, [the trial judge]'s [cautionary] instructions clearly reminded them that they could not apply a negative interpretation to his decision to exercise his constitutional right.

Independent of what [the trial judge] instructed the jury, his response to defense counsel's objection to [Prosecutor] McGettigan's remarks, *i.e.*, his conclusion that they were fair rebuttal, tells the [PCRA c]ourt [that the trial judge] would have denied a motion for mistrial. Accordingly, [Appellant's] claim only has merit if the record shows a reasonable probability that the Superior Court would have reversed that ruling as an abuse of discretion. ***See Commonwealth v. Smith***, 131 A.3d 467, 474-75 (Pa. 2015) ("We review the denial of a motion for mistrial under the abuse of discretion standard [because] 'a mistrial is an extreme remedy that is required only where the challenged event deprived the accused of a fair and impartial trial'"). That, however, is not the case.

In ***Commonwealth v. Wright***, 961 A.2d 119 (Pa. 2008), our Supreme Court reaffirmed that a mere error in judgment is not tantamount to an abuse of discretion when the question is whether the trial court should have granted a mistrial because of

- 17 -

a prosecutor's improper references to the defendant's decision not to testify. An abuse of discretion may not be found, it said, unless the judge's decision overrode or misapplied the law, was manifestly unreasonable, or was the result of partiality, prejudice, bias, or ill-will. "The trial court may grant a mistrial," it added, "only 'where the incident upon which the motion is based is of such a nature that its unavoidable effect is to deprive the defendant of a fair trial by preventing the jury from weighing and rendering a true verdict.'" Turning next to the law as it related to a prosecutor's improper references to a defendant's silence at trial, the **Wright** [C]ourt observed that a comment is forbidden if its language intentionally invites the jury to infer guilt from the defendant's failure to testify or highlights the fact that only the non-testifying defendant can rebut the Commonwealth's evidence. **Id.**

The statements at issue in **Wright** were the prosecutor's dual references to the defendant's failure to testify and his corollary identification of the defendant as one of the Commonwealth's "best witnesses." Even if not intended to implicate the defendant's right to remain silent, the Court concluded, those remarks were inappropriate. "However, not every reference to a defendant's failure to testify automatically requires a new trial; the verdict can still be sustained if the error was harmless," it added. If the record established beyond a reasonable doubt that the error could not have contributed to the verdict, the Court explained, there was no cause for redress. [The Court employed] a harmless error analysis [and] it found that the overwhelming evidence of guilt and the trial judge's cautionary instruction rendered the error harmless.

In this case, the allegedly improper comments, quoted above, were made while [Prosecutor] McGettigan was discussing [Appellant's] interview with Bob Costas. He had already reviewed and commented on much of the Commonwealth's evidence at that point, and was revisiting [Appellant's] explanation of events, which [Attorney] Amendola had commented on extensively during his closing.

With respect to the latter portion of the above-quoted argument, the [c]ourt fully agrees with Judge Cleland's assessment that it was fair rebuttal. [Appellant] parses out three discrete phrasings—"because he didn't provide you with something that could have been enormously helpful to us, could have solved many problems today;" "he could have provided it to anybody at

- 18 -

any time;" and "But he didn't provide that name [of Victim 2] to anybody, ever;" and challenges them as impermissible references to his post-arrest silence. They do not lend themselves to that interpretation when read in their broader context, though, sandwiched, as they were, between musings pertaining unequivocally to the Costas interview.

In this case, the broader context also includes Attorney Amendola's references to the same portion of the interview. Although [Appellant] did not testify, the whole of the Costas interview was admitted into evidence, and Amendola utilized it during his summation to remind the jury of every exculpatory statement his client had made and to argue that his decision to give the interview was indicative of his innocence. Part of that interview focused on McQueary's observations [regarding Victim 2], and Amendola, presumably in possession of a transcript, read the following exchange:

> Costas says, what about Mike McQueary, the grad assistant in 2008—we'll talk about it in a minute—walked into the shower where he said in specific detail that you were forcibly raping a boy who appeared to be 10 or 11 years old. That his hands were up against the shower wall and he heard rhythmic slapping sounds and he described that as a rape.
>
> [Appellant] said, I would say that's false.
>
> What would be his motive to lie, Costas says. [Appellant] says, you would have to ask him.
>
> Costas, what did happen in the shower that night that Mike McQueary happened upon you with a young boy?
>
> [Appellant], we were showering and horsing around and he actually turned all the showers on. This is in the shower stall at the, I guess, Lasch Building, and was actually sliding across the floor and we were, as I recall, possibly snapping a towel and horseplay.

Evaluating the parsed references within the context of [Attorney] Amendola's recitation and [Prosecutor] McGettigan's broader response, therefore, it is fanciful to imagine that the jury interpreted them as references to [Appellant's] election to remain silent.

A closer question arises with respect to [Prosecutor] McGettigan's first alleged reference to the [Appellant's] Fifth Amendment right, though.

Introducing his analysis of the Costas interview, [Prosecutor] McGettigan began by noting [Appellant]'s decision to speak out on Costas' show and reflecting on his damaging response to the question of whether he was sexually attracted to young boys. He proceeded to remind the jury of [Attorney] Amendola's explanation: that [Appellant] tended to repeat questions before answering them, and responded, "I wouldn't know. I only heard him on TV. Only heard him on TV."

While that language is reasonably susceptible to the interpretation [Appellant] proposes, i.e., that it is an impermissible reference to his post-arrest silence, it is equally susceptible to a far more innocent interpretation: that [Prosecutor] McGettigan could not use the one TV interview [Appellant] had given as a legitimate tool to assess the accuracy of [Attorney] Amendola's explanation.

The [PCRA c]ourt cannot say, of course, how each juror actually interpreted the prosecutor's comments. It can say, however, that they did not have the unavoidable effect of prejudicing the jury. [The trial court] foreclosed that possibility with a timely and reiterative cautionary instruction delivered immediately before the jury retired to deliberate. [A]s the foregoing discussion demonstrates, [Appellant] cannot prove a reasonable probability that the Superior Court would have deemed [Prosecutor] McGettigan's allegedly improper comments to be grounds for a new trial had trial counsel properly preserved the issue for appellate review.

PCRA Ct. Op., 10/18/17, at 52-57.

Based on our review, we conclude that the PCRA court's findings of fact are supported by the record and its conclusions of law were proper. Although Prosecutor McGettigan referenced Appellant's silence in his closing argument, those remarks were fair responses to Attorney Amendola's closing arguments about Appellant's interview with Costas. **See Cox**, 983 A.2d at 688; **Trivigno**, 750 A.2d at 248-49.

- 20 -

Moreover, as noted by the PCRA court, the trial court repeatedly instructed the jury with regard to the respective evidentiary burdens of both the prosecution and the defense. Therefore, the PCRA court properly concluded that even if Attorney Rominger moved for a mistrial, there was no reasonable possibility that the trial court would have granted a new trial, or that the outcome of the direct appeal would have been different. **See Daniels**, 963 A.2d at 419. Thus, Appellant's argument merits no relief.

> **3. Whether the [PCRA] court erred in finding counsel [was] effective in failing to call [A.M.] to the stand or using [A.M]'s prior exculpatory statements that [Appellant] did not molest him as substantive and/or impeachment evidence[.]**

Appellant also argues that he was entitled to relief based on trial counsel's failure to introduce exculpatory out-of-court statements by A.M. Appellant's Brief at 198. By way of further background, the PCRA court explained:

> When [Appellant] first read the grand jury presentment, [Appellant] named [A.M.] as the person eventually identified as Victim #2. A few days later, [A.M.] echoed [Appellant's] belief and told [Attorney] Amendola that nothing inappropriate had occurred in the shower on the date alleged. He likewise exonerated [Appellant] during an interview with Corporal Joseph Leiter in September of 2011. It was not long, however, before the young man was telling a completely different story.
>
> Within a week or two of their meeting, [Attorney] Amendola learned that [A.M.] had secured private counsel and was claiming to have been sexually abused by [Appellant] on multiple occasions. The young man continued to self-identify as Victim #2 but, instead of contradicting McQueary, proffered that the shower incident was only one of many sexual encounters between him and [Appellant].

- 21 -

PCRA Ct. Op., 10/18/17, at 28.

At the PCRA hearing, former Deputy Attorney General Jonelle Harter Eshbach (Eshbach) testified that she drafted the grand jury presentment, including McQueary's description of the incident between Appellant and Victim 2 as follows:

> As a graduate assistant, Michael McQueary put the sneakers in his locker, he looked into the shower. He saw a naked boy, Victim 2, whose age he estimated to be 10-years-old with his hands up against the wall being subjected to anal intercourse by a naked Appellant. The graduate assistant was shocked but noticed that both Victim 2 and [Appellant] saw him. The graduate assistant left immediately, distraught.

PCRA Hr'g, 8/23/16, at 4. When asked whether she considered A.M. to be Victim 2, she stated that although A.M. self-identified as Victim 2, Ms. Eshbach never identified him as such. *Id.*

Prosecutor McGettigan also testified that he did not believe A.M. was Victim 2:

> First of all, [A.M.], I believe, was born in 1987. And that would—the young boy described by Michael McQueary was 10-years-old. At the time of the incident, [A.M.] would have been at least 14. [A.M.], subsequently, was unable to describe the location in which the attack occurred. He drew a diagram which did not match. [A.M.], on the first interview, denied any untoward contact with [Appellant] over there. He denied it in an interview with state police. He subsequently, as I understand now, arrived at [Attorney] Amendola's office and again denied untoward contact with [Appellant]. And he only—frankly, I never spoke with him.
>
> The only information I had that alleged that he was, in fact, a victim of [Appellant], more specifically Victim Number 2, came from [A.M.'s attorney] Mr. Shubin, who refused to allow us to contact him and confirm whatever his client had to say until after Mike McQueary testified. And I believe at that hearing, that one

- 22 -

of Mr. Shubin's associates was present to listen to the details of Mike McQueary's observations, after which Mr. Shubin attempted to force [A.M.] on us because he now had, as some would say, an opportunity to conform the testimony to that of Mr. McQueary. So there are many reasons why [A.M.] was not, to me in my mind, then or now Victim Number 2. At any time.

*Id.* at 59.

Additionally, Prosecutor Fina testified that A.M. was unusable as a witness based on the various inconsistencies in A.M.'s accounts and also that "things he had said during the interviews were frankly not accurate." PCRA Hr'g, 8/23/16, at 35. Anthony Sassano, former chief investigator for the Office of the Attorney General (OAG), also testified regarding A.M. He stated that he agreed with the prosecution that A.M. did not testify credibly about his identity as Victim 2. *Id.* at 114.

Appellant argues that Attorney Amendola was ineffective for failing to introduce A.M.'s exculpatory statements, which would have contradicted McQueary's testimony regarding Victim 2. Appellant's Brief at 199. Specifically, Appellant refers to the following: (1) A.M.'s November 9, 2011 statement to Curtis Everhart, an investigator for the defense, in which A.M. claimed that he was Victim 2, but that McQueary's description of the shower incident was a lie and that Appellant never abused him; *see* PCRA Appx. Vol. 2, at 433; (2) A.M.'s September 20, 2011 interview with state police, in which A.M. told Corporal Joseph A. Leiter and Trooper James P. Ellis that Appellant never did anything that was inappropriate or made him feel uncomfortable; *see* PCRA Hr'g, 8/22/16, Ex. 8; and (3) A.M.'s statement to Postal Inspector

Corricelli on February 28, 2012, where A.M. did not mention any inappropriate contact by Appellant; *see* PCRA Hr'g, 8/22/16, Ex. 1. Appellant's Brief at 198-200.

As to the admissibility of A.M.'s statements, Appellant argues that A.M.'s "statements denying being abused by [Appellant were] statements against his pecuniary interest and [we]re admissible under Pa.R.E. 804(b)(3), where [A.M.] retained [an attorney] to file a civil action against Penn State on his behalf." *Id.* at 202. Appellant further contends that the statements were admissible to impeach McQueary's testimony. *Id.*

As to Attorney's Amendola's explanation for failing to introduce A.M.'s statement, Appellant claims that Attorney Amendola erroneously believed that if he introduced A.M.'s exculpatory statement, the Commonwealth could offer A.M.'s other statement to law enforcement or call A.M. as a witness. *Id.* at 202-03. Appellant argues that the Commonwealth could not have introduced any inconsistent statements by A.M. to law enforcement without violating Appellant's right to confront witness or giving A.M. an opportunity to explain the inconsistency. *Id.* at 204. Therefore, Appellant concludes that Attorney Amendola had no reasonable basis for failing to admit A.M.'s exculpatory statements at trial. *Id.*

As to prejudice, Appellant contends A.M.'s statements would have called into question McQueary's trial testimony that he saw Appellant assaulting Victim 2. *Id.* Additionally, Appellant argues that admission of A.M.'s statements "would have led to a reasonable probability that the outcome of

the trial would have been different, especially where a significant portion of the Commonwealth's case rested on allegations regarding shower incidents." *Id.* at 206.

Alternatively, Appellant argues that if A.M. were available at trial, then Attorney Amendola was ineffective for failing to present him as a witness. *Id.* at 206. He asserts that the Commonwealth would have been limited to introducing A.M.'s inconsistent statements to impeach him on the basis that he was lying for monetary gain. *Id.* This, he concludes, "would have aided trial counsel's defense relative to the other accusers." *Id.*

The Commonwealth first notes that the PCRA court concluded that A.M. was not unavailable, and therefore, his testimony could have not been admitted under Rule 804(b)(3). *See* Commonwealth's Brief at 145. However, the Commonwealth asserts that even if A.M. were unavailable, "[t]he trustworthiness of the statement would have had to be established to the satisfaction of the court, which would have been a challenge." *Id.* Additionally, the Commonwealth argues that A.M.'s exculpatory statements "would only have been admitted provided that they were supported by sufficient assurance of their reliability." *Id.* Specifically, "the defense would have been countering McQueary's live in-person testimony with the out-of-court statements of a young man being introduced for the limited purpose that they were made against his interest." *Id.* at 146.

"Hearsay is an out-of-court statement offered for the truth of the matter asserted. Hearsay generally is inadmissible unless it falls within one of the

exceptions to the hearsay rule delineated in the Pennsylvania Rules of Evidence." ***Commonwealth v. McGriff***, 160 A.3d 863, 873 n.6 (Pa. Super. 2017) (citations omitted), *appeal denied*, 176 A.3d 853 (Pa. 2017). The version of Rule 804 in effect at the time of trial provided, in relevant part:

**(a) Definition of unavailability.** 'Unavailability as a witness' includes situations in which the declarant:

(1) is exempted by ruling of the court on the ground of privilege from testifying concerning the subject matter of the declarant's statement; or

(2) persists in refusing to testify concerning the subject matter of the declarant's statement despite an order of the court to do so; or

(3) testifies to a lack of memory of the subject matter of the declarant's statement; or

(4) is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity; or

(5) is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance (or in the case of a hearsay exception under subdivision (b)(2), (3), or (4), the declarant's attendance or testimony) by process or other reasonable means.

A declarant is not unavailable as a witness if exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of a statement for the purpose of preventing the witness from attending or testifying.

**(b) Hearsay Exceptions.** The following are not excluded by the rule against hearsay if the declarant is unavailable as a witness:

\* \* \*

(3) *Statement Against Interest.* A statement that:

(A)    a reasonable person in the declarant's position would have made only if the person believed it to

be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

(B)   is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Pa.R.E. 804(a), (b)(3) (subsequently amended 2013).

The PCRA court initially noted that

The problem for [Appellant] is that the prosecution team never believed that [A.M.] was Victim #2. Not only was his drawing of the relevant locker room completely inaccurate, but his rendition of the shower incident, the details of which he divulged only after the Curley/Schultz preliminary hearing at which McQueary had testified, seemed to parrot the former assistant coach's testimony rather than reflect an independent recollection of the same event.

PCRA Ct. Op., 10/18/17, at 29.

Additionally, the PCRA court concluded that even if Attorney Amendola sought to admit A.M.'s statements at trial, his proffer would have been overruled, as

[Rule 804(b)(3)] only applies when the declarant is unavailable, however, and there is no evidence indicating that [A.M.] was unavailable at the time of trial. On the contrary, the record reflects that his attorney made him available as early as February of 2012, and that he in fact participated in at least three interviews between then and April of that year. The only references Agent Sassano and [Prosecutors] McGettigan and Fina made to [A.M.] being unavailable, in fact, related to their inability to locate him in 2011. Consequently . . . his allegation that the attorney was ineffective for not properly utilizing [the Rules of Evidence] to introduce [A.M]'s exculpatory statements [is] meritless.

- 27 -

*Id.* Finally, the PCRA court found that

> Attorney Amendola was not ineffective for failing to call [A.M.] as a witness or attempt to use his prior favorable statement(s) to impeach McQueary. Even assuming that counsel could have effectively controlled the young man so as to elicit only his prior exculpatory statements on direct, the Commonwealth would have brought the rest out on cross, and [Attorney] Amendola thought it best to avoid that risk. In his own words, "[I]t would have, I think, cast more concern and confusion on the whole issue than it did with him not even being in court." That was a legitimate fear, and [Attorney] Amendola wanted to avoid the potentially prejudicial effect of introducing yet another set of allegations the jury may have believed to be true and ultimately used against [Appellant] in its deliberations.

*Id.*

Based on our review, we agree with the PCRA court's conclusions, which are supported by the record. With respect to calling [A.M.] as a witness, Attorney Amendola testified that he had the opportunity to call [A.M.], but did not do so because he would be "useless" as a witness. Therefore, Appellant failed to establish that A.M. was unavailable, which was necessary to admit A.M.'s exculpatory statements under Rule 804(b)(3).

Even if A.M. were unavailable, Appellant failed to prove that Attorney Amendola lacked a reasonable basis for his decision not to admit A.M.'s exculpatory statement at trial.[11] *See Commonwealth v. Lesko*, 15 A.3d

---

[11] Appellant incorrectly asserts that Attorney Amendola did not admit A.M.'s exculpatory statements because he believed that doing so would allow the Commonwealth to call A.M. as a witness or introduce A.M.'s other statements to impeach him. However, the testimony cited by Appellant is in reference to Attorney Amendola's decision not to call A.M. as a witness at trial. *See* PCRA

345, 401 (Pa. 2011) (holding that where a PCRA petitioner failed to ask trial counsel about an omission when provided with the opportunity to do so at a PCRA hearing, the petitioner failed to demonstrate the reasonable basis prong of ineffectiveness). Specifically, Attorney Amendola believed that calling A.M. and then impeaching him with out-of-court statements would "cast more concern and confusion on the whole issue than it did with him not even being in court." PCRA Hr'g, 3/24/17, at 120.

Lastly, under these circumstances, we agree with the PCRA court that it was reasonable for Attorney Amendola not to call A.M. as a witness. As the PCRA court also noted, the Commonwealth maintained that A.M. was not Victim 2. Further, even though A.M. previously stated that he was Victim 2 and that the specific assault observed by McQueary did not occur, A.M. gave subsequent statements indicating that he was abused by Appellant. In his subsequent statements, A.M. indicated that McQueary observed the abuse on one occasion, and that Appellant abused him on numerous other occasions.

Accordingly, Appellant's claims with respect to A.M. fail. **See *Daniels***, 963 A.2d at 419.

> **4. Did the [PCRA] court err in determining counsel [was] effective in failing to present the grand jury testimony of Tim Curley, Gary Schultz and Graham Spanier?**

---

Hr'g, 3/24/17, at 120 (when asked whether A.M.'s initial statements would have proved favorable to the defense if A.M. were cross-examined or treated as a hostile witness, Attorney Amendola testified that "it would have, I think, cast more concern and confusion on the whole issue than it did with him not even being in court").

Appellant also claims that counsel was ineffective for failing to present grand jury testimony from Tim Curley, Gary Schultz, and Graham Spanier to impeach McQueary's testimony regarding Victim 2. Appellant's Brief at 161.

By way of further background to this claim, after seeing Appellant and Victim 2 in the shower of the Lasch Building, McQueary spoke with his father and a family friend, Dr. Jonathan Dranov, and then reported the incident to then-head coach Joe Paterno. N.T., 6/12/12, at 208. One week later, McQueary was called to meet with athletic director Timothy Curley and university vice president Gary Schultz. *Id.* During the fifteen-minute meeting, McQueary relayed to both men what he observed between Appellant and Victim 2 in the shower. *Id.* Approximately two weeks after his meeting with Curley and Schultz, McQueary received a phone call from Curley. *Id.* at 210. According to McQueary, Curley stated "that they looked into what [McQueary] had said" and also contacted The Second Mile, Appellant's charity organization. *Id.* After that phone call, McQueary did not hear anything further from Curley or Schultz about their response to his report, but continued to see Appellant at Penn State on a regular basis. *Id.* at 211.

Attorney Rominger filed a motion seeking to introduce the grand jury testimony of Curley, Schultz, and university president Graham Spanier. *See* Mot. *in Limine*, 6/11/17, at 1-3. Appellant argued that all three witnesses were unavailable and that their statements were admissible under Pa.R.E. 804(b)(3), relating to out-of-court statements made against a declarant's pecuniary interest. The PCRA court noted:

During oral arguments the following week, [Attorney] Rominger, who by then had read the relevant grand jury transcripts, narrowed the scope of his motion to pages 3-8 of Curley's testimony. Its purpose, he averred, was to impeach McQueary by demonstrating that [McQueary]'s report to Curley was more ambivalent than he had led the jury to believe. He acknowledged, though, that the evidence could turn out merely to be cumulative if [Dr.] Jonathan Dranov confirmed that the nature of the conduct McQueary described to them was equivocal, which he did. [The trial court] later denied the motion[.]

PCRA Ct. Op., 10/18/17, at 37.

Instantly, Appellant contends that the PCRA court erred in rejecting his claim that trial counsel should have sought to admit the grand jury testimony of Curley, Schultz, and Spanier under Rule 804(b)(1), relating to former testimony by an unavailable witness. Appellant's Brief at 161. He asserts that "the grand jury testimony of these men could have cast serious doubt on the credibility of McQueary and undermined the Commonwealth's case that [Appellant] was a serial shower rapist." *Id.* at 163.

Appellant submits that Attorney Rominger had no reasonable basis for failing to admit the grand jury testimony, and that counsel's decision "was based on the incorrect assumption that the Commonwealth could impeach these witnesses with charges that had not resulted in convictions." *Id.* at 164.

With respect to prejudice, Appellant argues that the proffered grand jury testimony would have "damaged McQueary's assertion that he believed what he saw [between Victim 2 and Appellant] was a sexual assault." Appellant's Brief at 167. Specifically, he claims that the grand jury testimony is "entirely

inconsistent with McQueary's belated assertion that he unquestionably informed these men of witnessing what he believed was a sexual assault." *Id.* at 167. Appellant concludes that "[c]onsidered in conjunction with the issue of trial counsel's failure to present A.M.'s exculpatory statements, as statements against interest, [Appellant] suffered prejudice." *Id.* at 168.

The Commonwealth counters that Appellant does not reference the exact testimony that should have been introduced, and asserts that Appellant has failed to demonstrate how the introduction of that testimony would have impacted the outcome of trial. Commonwealth's Brief at 119. The Commonwealth asserts that "[t]he best [Appellant] can offer is [Attorney] Amendola's testimony from the PCRA evidentiary proceeding that introduction of the grand jury testimony 'would have been very helpful'" which "falls short of his burden." *Id.* at 128. The Commonwealth also argues that Appellant did not establish that Spanier was unavailable, as he had no pending criminal charges at the time of the trial. *Id.* at 123. The Commonwealth concludes that counsel successfully executed his strategy to undermine McQueary's credibility on cross-examination, which resulted in a not guilty verdict for involuntary deviate sexual intercourse (IDSI), the most serious charge against Appellant with regard to Victim 2. *Id.* at 119.

Based on our review of the record, we discern no basis to conclude that Appellant demonstrated prejudice. First, Attorney Amendola extensively cross-examined McQueary regarding what he saw with respect to Victim 2. Based on this strategy, defense counsel successfully procured a not guilty

verdict with respect to the IDSI charge. Second, at trial, Appellant called Dr. Dranov, who testified that on the evening of the incident, McQueary did not describe seeing a particular sex act, but rather "implied that it had gone on with what he talked about [regarding] sexual sounds." N.T., 6/20/12, at 13. This testimony establishes the same theory as the one defense counsel sought to prove through Curley's grand jury testimony, in that McQueary's initial account of the incident was more ambivalent than what he eventually described at trial.[12]  Therefore, any further effort to impeach McQueary's testimony on that basis would have been cumulative. In light of the foregoing, we conclude that Appellant has failed to demonstrate prejudice related to counsel's failure to move for admission of the grand jury testimony under Rule 804(b)(1). *See Commonwealth v. Tharp*, 101 A.3d 736, 758 (Pa. 2014) (stating that "testimony was not necessary to avoid prejudice to [the a]ppellant because [the] proffered testimony was cumulative of evidence already presented by the defense"). Accordingly, his claim fails. *See Daniels*, 963 A.2d at 419.

> 5. **Whether the [PCRA] court erred in concluding that after-discovered evidence of [A.F.]'s, D.S.', and Matt Sandusky's recollection of the alleged crimes was based on receiving therapy, would not have, if presented at trial, led to a reasonable**

---

[12] Appellant notes that "McQueary's statements to [Dr. Dranov] were almost certainly the same as those relayed to Curley, Schultz, and Joe Paterno." Appellant's Brief at 163. However, Appellant does not acknowledge that the cumulative nature of the grand jury testimony is fatal to his assertion of prejudice.

**probability that the outcome of the trial would have been different[.]**

In his fifth claim, Appellant argues that the PCRA court erred in rejecting his claim that after-discovered evidence suggested that some of the allegations against him were recovered through repressed memory therapy. Appellant's Brief at 112. In support, Appellant first notes that before trial, A.F. underwent therapy with Dr. Michael Gillum. After trial, Dr. Gillum published a book "Silent No More," in which Dr. Gillum, according to Appellant, revealed that he used suggestive questioning to help A.F. recover memories of abuse. Second, Appellant emphasizes that, after trial, D.S. admitted that his therapists suggested that he had repressed memories. Third, Appellant refers to the post-trial statements made by his son, Matt Sandusky,[13] that he first remembered Appellant abusing him because of repressed memory therapy. *Id.* at 112-114. Appellant emphasizes a pattern that individuals would not acknowledge Appellant's abuse until they entered treatment. Additionally, Appellant obtained an expert, Dr. Elizabeth Loftus, who opined that several victims, including D.S., A.F., and B.H., underwent repressed memory therapy prior to trial.

---

[13] As discussed below, Matt Sandusky testified in support of Appellant at a grand jury proceeding and intended to testify on Appellant's behalf at trial. However, during trial, Matt, reported to the Commonwealth that Appellant abused him.

At the PCRA hearing, D.S., A.F., and B.H., testified, as did Dr. Gillum, A.F.'s therapist, and Dr. Loftus, Appellant's expert witness. The PCRA court summarized its findings as follows:

> During his direct testimony, [Dr.] Gillum . . . plainly and credibly stated, "I don't deal with repressed memory [and] I don't work with anyone who claims to have repressed memories or anything along those lines." He further articulated his negative assessment of repressed memory therapy and why he did not engage in it. While [D.S.] acknowledged that he and his therapist had discussed methods of unearthing repressed memories, . . . he stated definitively that he had not undergone that type of therapy prior to [Appellant's] trial.
>
> Dr. Loftus had a different opinion based on "impressions" from [Dr.] Gillum's book, statements [D.S.] made two years after the trial, and the fact that the victims whose excerpted trial testimony she reviewed did not give consistent stories to the police, the grand jury, and the trial jury. Having been rendered after an uncritical review of an absurdly incomplete record carefully dissected to include only pieces of information tending to support [Appellant's] repressed memory theory, however, that opinion was entirely ineffective to rebut Gillum's and [D.S.]'s definitive denials.

PCRA Ct. Op., 10/18/17, at 38-39.

Despite the PCRA court's findings, Appellant alleges that there is after-discovered evidence suggesting that A.F., D.S., and Matt Sandusky underwent repressed memory therapy. Appellant's Brief at 109. He asserts that "had this evidence been revealed, trial counsel could have presented expert testimony on repressed memory/false memories or filed a motion *in limine* to preclude testimony based on recovered memories and/or obtained therapy records to demonstrate the unreliability of memories enhanced by therapy and psychoanalysis." *Id.* at 116. Appellant concludes that "those who undergo

- 35 -

therapy are not actually lying, they are relaying false memories," and therefore, "the after-discovered evidence herein is not mere impeachment evidence as there is a distinction between credibility and reliability." *Id.*

The Commonwealth counters that, with respect to Dr. Gillum and D.S., Appellant has failed to meet the third prong of the after-discovered evidence test, which requires that the evidence in question not be used solely to impeach credibility.[14]  Commonwealth's Brief at 89.  The Commonwealth asserts that although Appellant "attempts to circumvent this barrier by pointing out that those who undergo repressed memory therapy are not lying" but are "simply relating false memories," there is no evidence that the witnesses underwent repressed memory therapy prior to trial.  *Id.*

To establish eligibility on the basis of after-discovered evidence, a petitioner must prove that (1) the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict if a new trial were granted.  *See Commonwealth v. Cox*, 146 A.3d 221, 227 (Pa. 2016).  In determining whether the evidence would compel a different verdict, "a court should consider the integrity of the alleged after-discovered evidence, the motive of those offering the evidence, and the overall strength of the

---

[14] The Commonwealth declined to address Appellant's claim regarding Matt Sandusky, as he did not testify at trial.

evidence supporting the conviction." ***Commonwealth v. Padillas***, 997 A.2d 356, 365 (Pa. Super. 2010) (citation omitted).

Instantly, the PCRA court concluded that Dr. Gillum testified credibly when he unequivocally denied using repressed memory therapy on his patients, which included A.F. The court also found that D.S. testified credibly in stating that he did not undergo repressed memory therapy prior to trial. The PCRA court further found that Dr. Loftus' opinion on Dr. Gillum's book and her conclusion that D.S. underwent repressed memory therapy was unreliable, and was based on an incomplete version of the record.

Given the PCRA court's findings, which are supported by the record, Appellant cannot establish that the proffered evidence would compel a different verdict. ***See Padillas***, 997 A.2d at 365; ***see also Mitchell***, 105 A.3d at 1265.

Moreover, despite Appellant's attempts to establish otherwise, the PCRA court's conclusion that the victims did not undergo repressed memory therapy prior to trial is supported by the record. Therefore, Appellant cannot establish that the evidence would be used for a purpose other than impeachment. ***See Commonwealth v. Weis***, 611 A.2d 1218, 1229 (Pa. Super. 1992) (stating that "[w]henever a party offers a witness to provide evidence that contradicts other evidence previously given by another witness, it constitutes impeachment"). Accordingly, Appellant's claim fails. ***See Daniels***, 963 A.2d at 419.

With respect to Matt Sandusky, Appellant references two interviews that were purportedly available online, and claims that they demonstrate that Matt Sandusky remembered abuse after he underwent repressed memory therapy.[15] **See** Appellant's Brief at 114. However, Matt Sandusky did not testify at trial, nor were charges filed relating to his allegations. Therefore, even if Matt Sandusky did undergo repressed memory therapy, that fact would not have compelled a different verdict in the present case. Accordingly, Appellant's claim fails. **See Daniels**, 963 A.2d at 419.

   6. **Did the [PCRA] court err in finding no actual prejudice where the Commonwealth repeatedly violated *Brady v. Maryland*, 383 U.S. 83 (1963), by failing to disclose material impeachment evidence and, in the alternative, not finding trial counsel ineffective in not raising the *Brady* violation?**

Appellant argues that the PCRA court erred in concluding that the Commonwealth's alleged **Brady** violations did not merit relief. Appellant's Brief at 60. Appellant raises two distinct claims with respect to alleged **Brady** violations by the Commonwealth.

First, Appellant claims that the Commonwealth withheld impeachment evidence in failing to disclose that some of the victims added new details about

_____

[15] Because neither interview was made part of the certified record, we cannot consider their contents on appeal. Moreover, based on Appellant's characterization of the interviews in his brief, it appears that Matt Sandusky stated that he initially did not remember the abuse, but the memories came back to him. **See** Appellant's Brief at 114. There is no indication that Matt Sandusky recalled those memories as a result of repressed memory therapy.

their abuse while interviewing with prosecutors prior to trial. *Id.* at 61. Specifically, Appellant states that D.S. "testified for the first time at trial that [Appellant] would give him bear hugs in the shower, kissed him, and touched him skin to skin. D.S. told [Prosecutor] McGettigan of these changes several months before trial, but McGettigan never disclosed this material impeachment evidence." *Id.* Additionally, Appellant asserts that another victim, "J.S.[,] had not, prior to his trial testimony, told anyone other than . . . McGettigan and his own attorneys, that [Appellant] allegedly kissed him on the shoulder, or that [Appellant] had washed his butt." *Id.* at 65. However, "J.S. told McGettigan this information in January before the trial," and the Commonwealth did not disclose those statement to the defense. *Id.* Both D.S. and J.S. testified at trial and their testimony related the more detailed allegations of abuse that they reported to the Commonwealth shortly before trial.

In a related claim, Appellant asserts that the Commonwealth violated *Brady* by failing to disclose records showing that several of the victims had undergone repressed memory therapy. *Id.* at 61. Although Appellant acknowledges that the Commonwealth has repeatedly denied the existence of such records, he argues that "the trial testimony belies that claim," in that "several accusers had been in therapy and came to believe they remembered being abused, when they had no such memories before therapy or the suggestive police interviews." *Id.* at 62. Appellant claims that had counsel been aware "that counseling and therapy was used to alter the accusers'

stories and/or helped them to remember allegations of abuse," counsel would have filed a pre-trial motion and sought an expert witness in order to challenge the witnesses' competency. *Id.*

To succeed on a *Brady* claim, a defendant must show that: "(1) the evidence at issue was favorable to the accused, either because it is exculpatory or because it impeaches; (2) the evidence was suppressed by the prosecution, either willfully or inadvertently; and (3) prejudice ensued." *Commonwealth v. Roney*, 79 A.3d 595, 607 (Pa. 2013) (citation omitted). The defendant carries the burden to "prove, by reference to the record, that evidence was withheld or suppressed by the prosecution." *Id.* (citation omitted). Additionally, "[t]he evidence at issue must have been 'material evidence that deprived the defendant of a fair trial.'" *Id.* (citation omitted). "Favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (citation omitted).

The Pennsylvania Supreme Court has further explained that

> *Brady* does not require the disclosure of information "that is not exculpatory but might merely form the groundwork for possible arguments or defenses," nor does *Brady* require the prosecution to disclose "every fruitless lead" considered during a criminal investigation. The duty to disclose is limited to information in the possession of the government bringing the prosecution, and the duty does extend to exculpatory evidence in the files of police agencies of the government bringing the prosecution. *Brady* is not violated when the appellant knew or, with reasonable

diligence, could have uncovered the evidence in question, or when the evidence was available to the defense from other sources.

*Id.* at 608 (citations and emphasis omitted).

### (a) Impeachment Evidence

In addressing this issue, the PCRA court concluded that there was "no question that the victims' late revelations were useful for impeachment purposes or that the Commonwealth failed to disclose them." PCRA Ct. Op., 10/18/17, at 40. However, the PCRA court found no relief was due, explaining:

> Thoroughly familiar with the witnesses' prior recorded statements and testimony, though, [Attorney] Amendola recognized the newest discrepancies and capitalized on them during cross-examination. In that regard, he was able to show the jurors not only that the victims continued to change their stories, but also that the prosecutor they were supposed to trust was being less than forthcoming. Thus, while the [c]ourt certainly does not condone the Commonwealth suppressing evidence under any circumstance, the fact is that [Attorney] Amendola's preparedness turned the Commonwealth's dereliction into a defensive advantage.
>
> Because proof of a *Brady* violation requires proof of prejudice, therefore, the defendant has also failed to establish that this second layer of his *Brady* claim has merit. What the record does establish, though, is that [Attorney] Amendola, because he was alert to the changes in the witnesses' accounts and exploited them accordingly, had no basis for filing a *Brady* motion either during the trial or afterward.

*Id.* at 39-40.

At the PCRA hearing, when asked if he believed that the Commonwealth's failure to disclose disparate witness statements was a *Brady* issue, Attorney Amendola stated:

I don't know so much I thought of it in those terms as much as I thought it was great - - it was great impeachment testimony, which showed the jury the dramatic changes in these kids' - - these young people's stories coincidentally associated with hiring private counsels and looking for big dollars from agencies and institutions like Penn State. But I certainly did not raise a **Brady** issue and ask for a mistrial. I thought, quite honestly, the fact that we elicited that information on the stand was very good for [Appellant].

PCRA Hr'g, 3/23/17, at 92-94.

The record supports the PCRA court's conclusion that Appellant failed to demonstrate that he suffered prejudice as a result of the Commonwealth's failure to disclose impeachment evidence prior to trial. Attorney Amendola testified that the inconsistencies in the victims' statements proved helpful for the defense during cross-examination. Had the Commonwealth provided the inconsistent statements to defense counsel prior to trial, it would not have led to a different result. Therefore, Appellant has failed to establish that he suffered prejudice due to the Commonwealth's failure to provide the statements to the defense in advance.[16] **See Roney**, 79 A.3d at 607.

### (b) Repressed Memory Therapy

Appellant maintains that the prosecution withheld evidence that several of the victims underwent repressed memory therapy prior to trial. **See**

---

[16] To the extent that Appellant argues that this evidence would have served to bolster his claim that the victims underwent repressed memory therapy, we disagree. The PCRA court concluded that there is no merit to Appellant's claim that the victims underwent repressed memory therapy; therefore, the disclosure of inconsistent victim statements would not have served to prove otherwise.

Appellant's Brief at 83. However, as discussed above, we find support in the record for the PCRA court's conclusions that the victims did not undergo repressed memory therapy. Therefore, there was no basis for trial counsel to pursue a **Brady** claim on this basis. **See Daniels**, 963 A.2d at 419.

> 7. **Whether the [PCRA] court erred in concluding [trial] counsel was effective in failing to present expert testimony that called into question the theory of repressed memory and demonstrated the likelihood of false memories[.]**

Appellant next argues that trial counsel was ineffective for failing to call an expert witness to testify on the subject of repressed memory. Appellant's Brief at 83. However, because Appellant has failed to establish error in the PCRA court's finding that the victims did not undergo repressed memory therapy before trial, we agree that trial counsel had "no reason to involve an expert, as his or her testimony would have been irrelevant." PCRA Ct. Op., 10/18/17, at 40-41. Accordingly, Appellant has failed to demonstrate arguable merit to this claim. **See Daniels**, 963 A.2d at 419.

> 8. **Did the [PCRA] court err in determining counsel was effective in neglecting to file a motion *in limine* and seek a hearing to preclude the use at trial of the victims' testimony that was gleaned by suggestive and improper police questioning?**

Appellant next claims that the PCRA court erred in concluding that Attorney Amendola possessed a reasonable basis for not filing a motion *in limine* challenging the competence of the victims. Appellant's Brief at 130-31. Appellant asserts that Attorney Amendola was not only aware that several of the victims' stories had evolved during their interviews with law

enforcement, but he also believed that the police had employed suggestive and improper interview techniques in speaking with the victims. *Id.* Therefore, Appellant contends that Attorney Amendola was ineffective for failing to file a motion *in limine* to preclude victim statements that resulted from improper police questioning. *Id.* at 125.

Appellant also argues that Attorney Amendola could have presented an expert "on suggestive questioning and its role with memory" and asked the trial court to make an initial determination regarding the reliability of the victims' statements. *Id.* at 128. Alternatively, Appellant argues that Attorney Amendola could have presented an expert to testify regarding memory at trial. *Id.* Appellant concludes that because part of Attorney Amendola's trial strategy was to expose these tactics used by police, counsel could have no reasonable basis for failing to file a motion or seek an expert to testify about the issue either in a pre-trial hearing or during trial. *Id.*

The Commonwealth counters that Attorney Amendola employed a sound strategy of attempting to impeach the credibility of the victims by exposing the inconsistencies in their accounts. Commonwealth's Brief at 89. Therefore, the Commonwealth concludes that "seeking to preclude testimony or have a witness explain the otherwise obvious points that counsel scored during cross-examination was not necessary." *Id.* at 90.

By way of background, at trial, Attorney Amendola sought to demonstrate that the police had employed suggestive tactics in questioning the victims. To that end, he introduced a tape-recorded police interview with

Victim 4, which he described as "a gift from heaven."  PCRA Hr'g, 5/25/17, at

109.

> At the PCRA hearing, Attorney Amendola explained that
>
> [t]he police and the Commonwealth had maintained throughout pretrial that these young men who were being interviewed were not coached, they simply were asked about [Appellant] and any situations that they may have had over the years with [Appellant], had they known, what they did, or contact, or so on, but they were never coached.  We didn't coach people.  This tape . . . contained an interview with one of the chief investigators . . . and interestingly enough a civil attorney who was representing the young man at that point.
>
> And after about maybe 45 minutes . . . this young man was not saying anything bad happened with [Appellant].  He was saying, much like the other people, nothing ever happened, [Appellant] was like a father to me, [Appellant] was great, he would take me on trips, we'd go to football camps and so on.  And they took a break.  And I think the young man, I think in his late 20s at that point, then left to take a smoke break.  He goes out with the one trooper and the other trooper then talks to the civil attorneys.
>
> Now what was interesting about the tape was the trooper says, we're going to now turn off the tape at such and such a time.  He thought he turned it off.  But he didn't, the tape kept playing.  And as the tape kept playing, even though they thought it was off, the civil attorney said to the trooper who was still in the room, how do we get this guy to say something happened?  How did we get him to admit something happened?  And the trooper in the room said at that point, I'll tell him what I told all the other people that we've interviewed, that [Appellant has] done this to other people, that it's okay for them to admit that [Appellant] did it . . . And then after he says that, the young man comes back with the other trooper.  And the trooper in the room, with the lawyer, says we're now going to turn the tape back on . . . and he proceeds to tell [Victim] 4 exactly what he said he was going to tell him, there are other people, don't be ashamed, and so on and so forth.  Clearly, . . . contrary to what we had been told through pretrial, no coaching, we just asked these people what happened.

PCRA Hr'g, 5/25/17, at 110-112.

As to his strategy, Attorney Amendola testified:

I thought that was a home run at the time. We played the tape. And I called the civil attorney who was in court monitoring his client and he testified. And he hemmed and hawed but eventually yeah, that was my voice, had to admit it of course it was, and admitted that there was a fee agreement, which we also showed as a motive that it was very important for [Appellant] to be convicted. Because if he was convicted, it would be a lot easier for these people to get money from places like Penn State and The Second Mile. So all that came out at trial.

*Id.* at 113.

Although Attorney Amendola had the tape of Victim 4's statement before trial, he did not procure an expert to testify about the effect of the suggestive police tactics, "[b]ecause I thought [the interview tape] was dynamite evidence that I wanted to use at trial and certainly didn't want to tip off the prosecution." *Id.* at 115.

Attorney Amendola further testified that although he believed that other witnesses' recollection may have been a product of suggestive questioning,

[w]e also had information that was totally inconsistent at points with virtually all of these young people who were appearing as accusers. So our theory was to cross-examine them, point out the inconsistencies that developed through the course of several interviews and their grand jury testimony, for example, and cross-examine them on that.

*Id.* at 115.

The PCRA court found Attorney Amendola's testimony credible, and concluded that

> [w]hether any given victim tailored his story to mesh with what the police or other victims were saying was instead a matter to be explored during cross-examination, which is precisely what [Attorney] Amendola did. Accordingly, the attorney was not ineffective for failing to file a motion to disqualify the victims as witnesses on account of the allegedly improper police interviews.

PCRA Ct. Op., 10/18/17, at 41.

We agree with the PCRA court's conclusions. As indicated by the PCRA court, evidence of suggestive police questioning is insufficient to support a challenge to the competency of a witness. *See* Pa.R.E. 601 (stating that generally, "[e]very person is deemed competent as a witness" unless the court finds that, because of a mental condition or immaturity, the witness "(1) is, or was, at any relevant time, incapable of perceiving accurately; (2) is unable to express himself or herself . . . ; (3) has an impaired memory; or (4) does not sufficiently understand the duty to tell the truth"). At the time of trial, all of the victims had reached the age of maturity, and thus it was proper for Attorney Amendola to explore issues relating to the reliability of their memories on cross-examination. *See Commonwealth v. Judd*, 897 A.2d 1224, 1229 (Pa. Super. 2006) (stating that, after a witness reaches the age of fourteen, concerns about the witness' susceptibility to falsely implanted suggestions are "rendered totally irrelevant as a matter of law" because "any issue with [the witness'] inability to correctly remember the events in question is properly a question of credibility, and not of taint").

Accordingly, the record supports the PCRA court's conclusion that Attorney Amendola employed a reasonable strategy in using cross-

examination to expose allegedly improper police tactics. Therefore, the PCRA court correctly concluded that counsel was not ineffective on that basis. Accordingly, no relief is due. *See Stewart*, 84 A.3d at 707; *Daniels*, 963 A.2d at 419.

> **9. Did the [PCRA] court err in holding counsel was effective for failing to introduce a recorded statement by James Calhoun in which he contradicted Ronald Petrosky's testimony and Calhoun denied observing [Appellant] performing any sex acts with a boy in a shower?**

Appellant's next argument focuses on trial counsel's failure to introduce an exculpatory out-of-court statement by James Calhoun. Appellant's Brief at 145. As noted above, in the fall of 2000, Calhoun allegedly saw Appellant abuse Victim 8 in the shower area of the school locker room. Calhoun did not testify at trial. However, the PCRA court explained:

> On the third day of trial, Ronald Petrosky testified about James Calhoun's statements regarding sexual contact he had witnessed between [Appellant] and Victim #8. According to Petrosky, Calhoun was cleaning in the Lasch building's staff locker room when he saw a man performing fellatio on a boy in the shower. A few minutes before, Petrosky had himself seen two pairs of legs—one hairy and one skinny—in the shower and quickly exited the locker room until they left. As he waited in the hallway, he saw [Appellant] and a small boy emerge and watched the older man take the boy's hand as they walked down the hall. No one else entered the locker room as Petrosky waited outside, and Calhoun soon confirmed to him that [Appellant] was the man he saw in the shower.

> After entertaining extensive arguments from counsel, Judge Cleland concluded that Calhoun's statements qualified as "excited utterances" and that there was sufficient corroborating evidence

- 48 -

to ensure that any convictions pertaining to Victim #8 were not based solely on Calhoun's statements.[17]

PCRA Ct. Op., 10/18/17, at 30-31.

Petrosky thereafter testified at trial about his conversation with Calhoun.

> I could see that [Calhoun] was upset. His face was white. His hands was trembling. I thought it was a medical condition. I said, "Jim, what's wrong?" And this is how he said it to me. He said, "Buck,"—that's my nickname. He said. "Buck, I just witnessed something in there I'll never forget the rest of my life." I said, "What are you talking about, Jim[?]" He said that man that just left, he had this—the boy up against the shower wall licking on his privates. I said, "Are you sure that man who just left?" He said, "I'm sure." I said, "You know who that is?" I said, "That's [Appellant]." **He didn't know who he was but he knows what he seen that night.**

N.T., 6/13/12, at 229 (emphasis added).

Appellant's present claim focuses on Calhoun's tape-recorded interview with the state police, which was taken on May 15, 2011, approximately eleven years after the incident and one year before trial. During Calhoun's interview, the following relevant exchange occurred:

> Q: Do you remember if that was [Appellant] that you saw?
>
> A: No, I don't believe it was.
>
> Q: You don't?
>
> A: I don't believe it was. I don't think [Appellant] was the person. It wasn't him. There's no way. [Appellant] never did anything at all that I can see that he was, but, uh, it was . . .

_____

[17] Appellant's challenge to direct appeal counsel's failure to challenge the trial court's evidentiary ruling is discussed below.

Q:     But you remember seeing this guy and this boy, huh?

A:     Yeah.

PCRA Hr'g, 3/24/17, at 73.

At the PCRA hearing, Attorney Amendola explained his decision not to

use Calhoun's 2011 statement, in part, as follows:

> We were aware that apparently at that [2011] interview that [Calhoun] was saying that the person he saw wasn't [Appellant]. But this [statement] was made by a man whose doctor was saying that he was incompetent and he would slide in and out of consciousness and ability to know which end was up at any given time.   Whereas, the evidence presented by the other janitor[, Petrosky,] the night that this incident allegedly occurred was very definitive.   But we were aware of that interview, yes.

*Id.* at 70-71.   However, Attorney Amendola also testified that he believed he

played a tape of James Calhoun's 2011 statement at trial, and that he could

not recall whether he received or reviewed the tape before trial.   *Id.* at 70,

77-79.   Attorney Amendola stated that if he had reviewed and "thought it was

an issue," he would have "raised it at some point."   *Id.* at 77-78.

The PCRA court, in rejecting Appellant's claim, noted:

> [i]n cross-examining Petrosky, [Attorney] Amendola focused primarily on the inconsistencies between his grand jury and trial testimony.   [Amendola] also explored the fact that Petrosky had waited until approximately eleven years after witnessing the incident to mention it to authorities.   [Amendola] did not introduce evidence of a [tape-recorded] interview Calhoun had given to a state trooper the year before wherein he denied that [Appellant] was the man he had seen, however, and [Appellant] contends that he was ineffective because of it.   The record indicates otherwise.
>
> . . . [Attorney] Amendola learned at some point prior to trial that Calhoun was incompetent to testify due to dementia which had progressed to the point that Calhoun "would slide in and out of

- 50 -

consciousness and ability to know which end was up at any given time." Weighed against Petrosky's testimony about what he had personally observed and what a lucid Calhoun had expressed to him years earlier, though, Amendola did not deem Calhoun's subsequent contradiction to be useful impeachment evidence. That was not a *post hoc* assessment, but an informed and reasonable pre-trial decision.

PCRA Ct. Op., 10/18/17, at 31 (record citations omitted).

Appellant argues that Calhoun's statement during the 2011 interview should have been admitted at trial, as it was "critical evidence" and was "directly contradictory to what Petrosky testified." Appellant's Brief at 150-51. Appellant contends that the record does not support the PCRA court's conclusion that Attorney Amendola provided a reasonable basis for his decision not to use Calhoun's 2011 statement at trial. Appellant notes that Attorney Amendola testified that he was uncertain whether he reviewed a transcript or tape of the interview before trial. *Id.* at 146. Appellant also asserts that Attorney Amendola testified that he would have used Calhoun's 2011 statements had he reviewed the interview. *Id.* at 146-47. Moreover, Appellant asserts that the fact of Calhoun's "compromised mental state" would have gone to the weight of the evidence and "[i]n light of the exceptionally meager evidence concerning alleged Victim 8, there is a reasonable probability that the unidentified victim was not assaulted by [Appellant] had the statement been provided." *Id.* at 152.

The Commonwealth counters that even if Calhoun's 2011 statement had been admitted at trial, "it would have done nothing to dispel the significant fact that Calhoun had just witnessed a child being abused." Commonwealth's

Brief at 117. Moreover, the Commonwealth argues that "[e]ven if Calhoun did not believe it was [Appellant] who had assaulted the child, the jury would still have had to evaluate the recording against Petrosky's credible testimony that he saw two sets of legs in the shower and that [Appellant] emerged from the locker room shortly thereafter with a young child." *Id.* at 117. Additionally, the Commonwealth references Petrosky's testimony regarding his own observations of Appellant and Victim 8, in which he indicated that "[b]oth of them had wet hair" and that "no one else entered the locker room while he was standing in the hallway and no one exited except for [Appellant] and Victim 8." *Id.*

Instantly, although there was conflicting evidence as to whether Attorney Amendola reviewed the 2011 interview before trial, the PCRA court resolved those conflicts against Appellant. The court's finding that Attorney Amendola made a reasoned determination about the value of the 2011 statement before trial is supported by the record and binding on this Court. *See Mitchell*, 105 A.3d at 1265; *Ousley*, 21 A.3d at 124.

Further, given Calhoun's mental state, it was reasonable for Attorney Amendola to focus on exposing the inconsistencies in Petrosky's testimony on cross-examination, rather than admit an out-of-court statement by an arguably incompetent witness. Moreover, in both 2000 and in 2011, Calhoun unequivocally stated that he witnessed sexual abuse between an older man and a young boy. Calhoun was not familiar with Appellant at the time of the incident. Accordingly, Calhoun's 2011 statement indicating uncertainty as to

Appellant's identity as the man in the shower was not wholly inconsistent with his 2000 statement. Therefore, reading **either** of Calhoun's statements, when read in conjunction with Petrosky's testimony identifying Appellant, would have likely led to the same result at trial. *See Stewart*, 84 A.3d at 707. Thus, Appellant has failed to demonstrate prejudice related to the failure to admit Calhoun's 2011 statement.

10. **Whether the court erred in determining that appellate counsel was effective in not arguing on appeal that Petrosky's testimony, relative to Calhoun's hearsay statement, was inadmissible as an excited utterance as there was no corroborating evidence that [Appellant] sexually abused the alleged victim and in concluding that trial counsel and direct appellate counsel were effective when they failed to appeal [Appellant]'s convictions relating to Victim 8 as lacking sufficient evidence[.]**

Appellant also claims he was entitled to relief on his assertion that Attorney Gelman was ineffective for not challenging the admission of Calhoun's 2000 statement about Victim 8 on direct appeal. Appellant's Brief at 152. Appellant claims that the Commonwealth failed to establish independent corroboration that a startling event actually occurred—*i.e.*, that Calhoun observed an older male abusing Victim 8 in the shower—and therefore, Calhoun's statement should not have been admitted. *Id.* at 154 (suggesting that "[t]here is no evidence that [Appellant] performed oral sex on an unidentified victim other than the hearsay statement"). Appellant claims that Attorney Gelman's decision to forgo this meritorious claim was

unreasonable and resulted in the abandonment of a reasonable possibility that Appellant would have been granted a new trial as to Victim 8. *Id.* at 155-56. In support, Appellant cites to **Commonwealth v. Barnes**, 456 A.2d 1037 (Pa. Super. 1983).

Additionally, Appellant argues that Attorney Amendola and Attorney Gelman were both ineffective for failing to challenge the sufficiency of the evidence for Appellant's convictions relating to Victim 8, as they were based solely on Calhoun's statement. *Id.* at 152. Appellant argues that Calhoun's statement was an insufficient basis upon which to convict Appellant, and therefore, counsel should have pursued the claim as grounds for relief. *Id.* He further claims that, had counsel pursued a sufficiency challenge, it would have affected several other convictions, and not just his conviction with respect to Victim 8. *Id.* at 160.

The Commonwealth counters that the relevant convictions were not based solely on Calhoun's statements, as Petrosky's independent observations provided sufficient corroboration. Commonwealth's Brief at 111. The Commonwealth further contends that even if the convictions were based solely on hearsay, there was a sufficient basis to sustain the convictions under **Commonwealth v. Sanford**, 580 A.2d 784 (Pa. Super. 1990). Finally, the Commonwealth asserts that Appellant's claim fails for lack of prejudice. The Commonwealth notes that "even if [Appellant] would have prevailed on the sufficiency of the evidence claim on direct appeal, vacating the convictions related to Victim 8 would not have altered the overall sentencing scheme[,]"

as "[t]he trial court specifically ordered that the sentences on counts 36 through 40 were to run concurrently with all of the other counts."[18] *Id.* at 112. The Commonwealth further contends that Petrosky's observations corroborated the existence that an exciting event occurred. *Id.* at 114.

With respect to Appellant's claim that Attorney Gelman was ineffective for failing to raise this issue on appeal, PCRA court concluded:

> Once [Appellant] was convicted and sentenced relative to Victim #8, moreover, it was not ineffective for [Attorney Gelman] to forego challenging the rulings that allowed the jury to consider the charges. There was no meritorious Confrontation Clause issue to be raised, and whether or not Judge Cleland should have excluded Calhoun's hearsay statements, counsel made a reasonable strategic decision not to challenge those convictions since [Appellant] would not have realized any benefit from a favorable Superior Court decision.

PCRA Ct. Op., 10/18/17, at 33.

We note that at the PCRA hearing, Attorney Gelman testified regarding this issue as follows:

> I recall specifically rejecting it as something that was not to be raised. And I rejected it because even if we won the issue and if the hearsay identification were to have been held to be invalid, and if we had won everything that there was to win about that claim and that incident, it would not have benefitted [Appellant] at all. One, because it was only one count of many and his sentence would have stood for the others. And two, the trial judge had run his sentence on that count, the Calhoun count, concurrently with other sentences. So one concurrent sentence would have fallen. It would not have made a difference to

---

[18] We note that Appellant suggests that the trial court imposed concurrent sentences for the crimes committed against Victim 8, because the court recognized that "the evidence was weak and the convictions might be overturned." Appellant's Brief at 158.

[Appellant]'s total sentence. And it would have distracted the Court because it wasn't [sic] an arresting [sic] issue. And it would have drawn their attention from my other issues, which could have benefitted [Appellant] tremendously for the sake of negating a sentence that was concurrent and did not involve giving [Appellant] any more or less time.

This was—this issue was not touched on direct appeal. It would divert the attention of the judges from other more substantial issues which could benefit [Appellant]. Winning this issue would not have benefitted him at all, as the sentence was concurrent. And it was an interesting issue. And with limited time, I thought the Court would invest too much time in this issue because it was of interest.

PCRA Hr'g, 5/11/17, at 30, 36.

Based on our review of the record, we discern no abuse of discretion in the PCRA court's conclusion that Attorney Gelman acted reasonably when declining to pursue a challenge to Petrosky's testimony regarding Calhoun's statement. We add that Attorney Gelman's strategy on appeal focused on obtaining a new trial for Appellant as to all victims by challenging the jury instructions and the trial court's denial of trial counsels' motion for continuance. Under these circumstances, we cannot conclude that no competent counsel would have omitted this challenge on appeal. *See Stewart*, 84 A.3d at 707.

As to the sufficiency of the evidence, we discern no merit to Appellant's contention that this Court would have vacated Appellant's convictions regarding Victim 8. Indeed, in *Barnes*, this Court concluded that there was sufficient evidence sustaining a conviction based solely on hearsay evidence. *See Barnes*, 456 A.2d 1039; *see also Commonwealth v. Weaver*, 76 A.3d

562, 569 (Pa. Super. 2013) (noting "the law is clear that we are required to consider all evidence that was actually received, without consideration as to the admissibility of that evidence or whether the trial court's evidentiary rulings are correct" (citation omitted)). Accordingly, we conclude that Appellant's claim that trial and direct appeal counsel were ineffective for failing to challenge the sufficiency of the evidence lacks merit. **See Daniels**, 963 A.2d at 419.

> **11. Did the [PCRA] court err in finding [Attorney] Amendola was effective in neglecting to adequately review discovery?**

Appellant also claims that counsel was ineffective for failing to adequately review discovery. Appellant's Brief at 194. Specifically, Appellant argues that Attorney Amendola did not review (1) the transcript and recording of the 2011 interview with Calhoun or (2) Matt Sandusky's grand jury testimony. **Id.** Appellant asserts that "had Amendola adequately reviewed discovery[,] he could have played the Calhoun tape, calling into question the hearsay testimony of Petrosky." **Id.** at 198. He further claims he suffered prejudice because, without reviewing Matt Sandusky's grand jury testimony, "Amendola could not adequately discuss [Appellant]'s decision not to testify based on the Matt Sandusky issue."[19] **Id.** Appellant also asserts that Attorney

---

[19] Appellant's issue regarding Attorney Amendola's advice for Appellant not to testify at trial based, in part, on matters relating to Matt Sandusky are discussed below in greater detail. At this juncture, we note that Appellant fails to establish that trial counsel was unaware that Matt Sandusky exculpated Appellant when testifying before the grand jury.

Amendola was ineffective for testifying at the post-sentence motions hearing that none of the documents he reviewed after trial would have changed his trial strategy. *Id.*

> With respect to Calhoun's statement, the PCRA court explained that

> [t]he proffered interview occurred on May 15, 2011, and Amendola learned at some point prior to trial that Calhoun was incompetent to testify due to dementia which had progressed to the point that Calhoun "would slide in and out of consciousness and ability to know which end was up at any given time." Weighed against Petrosky's testimony about what he had personally observed and what a lucid Calhoun had expressed to him years earlier, though, Amendola did not deem Calhoun's subsequent contradiction to be useful impeachment evidence.

PCRA Ct. Op., 10/18/17, at 31.

> With respect to Attorney Amendola's review of Matt Sandusky's grand jury testimony, the PCRA court concluded that

> [w]hether or not he had perused the transcript, Amendola knew what Matt Sandusky [] had told the grand jury. As he stated, "I knew the substance of [his testimony]. I certainly knew that he had defended his father at that proceeding." That was only to be expected, because until mid-trial, Matt [Sandusky] was standing by his father. He was scheduled to be a defense witness, and he and Amendola had discussed his testimony. ("Matt Sandusky . . . had told us he would testify for his dad and testify as to fact situations ironically involving Brett Swisher Houtz . . . Matt Sandusky indicated to [the Commonwealth] that he was in fact present when certain things occurred with Mr. Houtz"). Those discussions, as the attorney's answer plainly suggested, included what Matt Sandusky had relayed to the grand jury.

> When Matt [Sandusky] aligned himself with the Commonwealth, then, [Attorney] Amendola knew [Matt Sandusky] could be impeached with his grand jury testimony, and he and [Appellant] discussed the pros and cons of proceeding with their plan for [Appellant] to testify. That discussion included Matt [Sandusky]'s

- 58 -

impeachability, and specifically his impeachability via reference to
his grand jury testimony.

*Id.* at 19-20.

Regarding Attorney Amendola's testimony at the post-sentence hearing,

the PCRA court explained:

> Testifying at [Attorney Amendola's] post-sentence motions
> hearing, Amendola talked about the plethora of discovery
> materials he was receiving in the months leading up to trial and
> how it adversely affected his ability to adequately prepare for trial.
> During cross-examination, though, it became apparent that most
> of the last-minute materials he received were not pertinent. He
> continued nonetheless to advance the idea that the volume of
> discovery he was receiving in such a compressed period of time
> hobbled the defense, but admitted that he had reviewed
> everything post-trial and that much of it was irrelevant. He
> admitted, moreover, that none of the documents he reviewed
> would have altered his conduct at trial. The Superior Court
> subsequently utilized that admission as its basis for finding that
> Judge Cleland's denial of the defendant's motions for continuance
> did not result in prejudice.

*Id.* at 19 (citations omitted).

Finally, the PCRA court determined that

> [m]ore broadly, the record reflects that [Attorney] Amendola had
> indeed reviewed with care the discovery materials most relevant
> to his trial strategy, including the victims' many statements, and
> was well prepared to cross-examine each witness the
> Commonwealth presented. Conversely, the materials he was
> unable to scrutinize before trial consisted mostly of irrelevant
> documents not subject to discovery under Rule 573 of the
> Pennsylvania Rules of Criminal Procedure.
>
> Whether it considers Matt Sandusky's [grand jury] testimony,
> Calhoun's 2011 interview, or the record as a whole as it relates to
> discovery, therefore, the [c]ourt finds no merit to the proposition
> that Amendola failed to adequately review it.

*Id.* at 20 (record citations omitted).

Following our review, we conclude that the PCRA court's findings are supported by the record. The PCRA court found that Attorney Amendola testified credibly regarding his review of the discovery materials and articulated a reasonable strategy for which materials to utilize at trial. *See Id.* Accordingly, no relief is due. *See Mitchell*, 105 A.3d at 1265 (stating that "[t]he PCRA court's credibility determinations, when supported by the record, are binding on this Court"); *see also Daniels*, 963 A.2d at 419.

> **12. Whether the [PCRA] court erred in concluding counsel [was] effective in advising [Appellant] not to testify based on factually and legally erroneous advice that Matt Sandusky would be called in rebuttal and in not making a motion to preclude Matt Sandusky from testifying or [Appellant] being asked questions beyond the scope of direct examination regarding Matt Sandusky[.]**

Appellant next claims that Attorney Amendola was ineffective for advising him not to testify at trial based on the belief that Matt Sandusky, Appellant's son, would be called as a rebuttal witness. Appellant's Brief at 59.

By way of background, Matt Sandusky previously testified before a grand jury in support of Appellant. Attorney Amendola originally planned to call both Matt Sandusky and Appellant as witnesses for the defense at trial. *See* N.T., 6/20/12, at 65-66. However, shortly before the close of the Commonwealth's case-in-chief, Matt Sandusky approached the prosecution

and reported that he was a victim of Appellant's abuse. *See id.* Attorney

Amendola altered his strategy based on this new development. *Id.*

At trial, Attorney Amendola explained how Appellant made his decision

not to testify.

> The Commonwealth, as the court knows, in a conference call with me and the court, I believe [Prosecutor] McGettigan and [Prosecutor] Fina last Thursday evening, after the Commonwealth had all but closed, but late hour of the day, asked for permission to remain open pending an investigation that was occurring at that time. Contacted me by phone somewhere, I believe it was 8:00 or 8:30 p.m., and advised me that Matt Sandusky, [Appellant's] son, had approached them, had interviewed with them, and made a statement that his father had abused him and that they potentially intended to use this testimony, this evidence at trial.
>
> Now, up until that time, Your Honor, [Appellant] had always wanted to testify on his own behalf. He always wanted to tell people his side to the allegations in this case. However, that potential evidence, whether true or not, was so devastating and so is—I think [Prosecutor] Fina has used the term in the past[,] so nuclear to his defense, from that point on we were very concerned whether or not [Appellant] could testify.
>
> [Prosecutor] Fina later narrowed the scope of that potential damage by indicating to me that the Commonwealth would agree not to call Matt Sandusky in its case in chief but reserved the right to call him as a rebuttal witness should evidence come out at trial that would allow him to testify and more specifically, obviously, if [Appellant] testified at trial, which still left us with a grave concern.
>
> Subsequently, we also found out there was another part of the interview with Bob Costas when [Appellant] interviewed with him shortly after his arrest in these matters by phone. That interview was by phone, which statement that we anticipated the Commonwealth would cross-examine [Appellant] on, although, in our opinion, it was unclear as to what he was saying and the context of getting a specific answer from him certainly in our opinion would have opened the door for rebuttal testimony from Matt Sandusky.

Because of that situation, as well as the admitted part of [Appellant]'s interview with Mr. Costas, specifically relating to the part of are you sexually attracted to young boys, and that was the part that was played twice and the court corrected that issue, we felt [Appellant] could give no answer at trial that would not allow the Commonwealth to call Matt Sandusky as a rebuttal witness.

So after many discussions with [Appellant], based upon that evidence, [Appellant] chose not to testify despite the fact I had at least [alluded] in my opening statement on a number of occasions to the jury that they would hear from [Appellant].

Our position on the Matt Sandusky development coming literally at the close of the Commonwealth's case basically took the heart out of our defense, because our defense was going to be [Appellant] testifying.

Today, after we called our last fact and character witness, the Court gave us time to consult with [Appellant] as to whether or not he wanted to testify with all this information before him, and he decided that he did not want to testify for the reasons I have set forth.

*Id.* at 65-72.

At that time, Attorney Amendola moved for a mistrial on the basis that Matt Sandusky's statement effectively derailed the defense's theory of the case. *Id.* at 70. He argued that the late development caused "extreme prejudice" because the defense did not have an opportunity to change strategies before trial. *Id.* at 70.

The Commonwealth responded that there was no legal basis for a mistrial. *See id.* at 72. The Commonwealth also explained that

[w]e certainly have represented to Attorney Amendola, I personally did, that we would not use Mr. Matt Sandusky's testimony in our case in chief; that we would reserve him for rebuttal and use him only if his testimony would be admissible and relevant to rebuttal.

- 62 -

After discussions here today regarding the potential testimony of [Appellant], we agreed that we would not use Matt Sandusky in rebuttal. After that agreement, I believe Attorney Amendola spoke with his client, came back, and wanted further conditions on [Appellant]'s testimony. Wanted us to agree in addition to not putting Matt Sandusky on rebuttal that we would not ask any questions of [Appellant] about Matt Sandusky, and that was an agreement that we could not comply with. So I just wanted to clarify that.

*Id.* at 74.

The trial court denied Appellant's motion for a mistrial and directed Attorney Amendola to colloquy Appellant on Appellant's right to testify, during which the following relevant exchanges occurred:

Q:    Have we discussed on a number of occasions, but more recently, most recently within the last half hour to 45 minutes, your right to testify on your own behalf at your trial?

A:    Yes.

Q:    And have we discussed that on many different occasions since you were charged with these offenses since last November?

A:    Yes.

Q:    And prior to learning about your son, Matt Sandusky's, statement to the attorney general staff that somehow you inappropriately sexually touched him, was it your intention to testify at this proceeding?

A:    Yes.

Q:    Do you understand that you have the right to testify?

A:    Yes.

* * *

Q:    Have counsel discussed with you the pros and cons of testifying?

A:     Yes.

Q:     The advantages and disadvantages?

A:     Yes.

Q:     And the likelihood in this instance that if you were to take the stand and testify, virtually anything you said after you were sworn in would in all likelihood, if not certainly, trigger the ability of the Commonwealth to call your son, Matthew Sandusky, as a witness against you in rebuttal?

A:     Yes.

Q:     Is that the reason why you have chosen not to testify?

A:     Yes.

Q:     Are you making this decision -- granted that it has to do with Matthew and the information that came out last Thursday evening, but aside from that, given that fact, is this decision on your part not to testify given the current circumstances being made by you knowingly?

A:     Yes.

Q:     Is it being made intelligently?

A:     Yes.

Q:     Is it being made voluntarily?

A:     Yes.

Q:     Has either Mr. Rominger or myself or anybody else on the defense team or anybody in your family or any of your friends coerced you into testifying or not testifying?

A:     No.

Q:     Is this your own decision?

A:     Yes, it is.

Q:     Based upon the posture of the case?

A:     Correct.

*Id.* at 76-81.

After the colloquy, the Commonwealth sought to clarify its position regarding Matt Sandusky's statement. *Id.* at 81. The Commonwealth reiterated that it agreed not to call Matt Sandusky as a rebuttal witness, but would not agree to abstain from questioning Appellant about Matt Sandusky if he chose to testify. *Id.*

The Commonwealth also moved to strike the portion of the colloquy regarding Matt Sandusky from the record, arguing that "the real basis for [Appellant's] declining to testify is a full understanding of his legal position and not on the one thing I'm concerned about is an appellate issue for that reason, because we have already agreed Matt would not testify." *Id.* at 82-83. The trial court denied the Commonwealth's motion to strike, and concluded that Appellant's decision not to testify was knowing, intelligent, and voluntary. *Id.* at 83.

Appellant claims that absent Attorney Amendola's erroneous advice regarding the possible admission of Matt Sandusky's testimony, Appellant would not have waived his right to testify at trial. Appellant's Brief at 55-56. Appellant argues that trial counsel could have limited his exposure to the Commonwealth's questions on cross-examination by preparing Appellant for his trial testimony, asking very limited questions on direct examination, by filing a motion *in limine* to either preclude Matt Sandusky from testifying, or by limiting the scope of cross-examination to prevent the Commonwealth from asking Appellant about Matt Sandusky. *Id.* at 55, 58.

The Commonwealth responds that the exact reason for Appellant's decision not to testify "was not required to be placed of record" and "[i]instead, this Court must consider whether counsel interfered with [Appellant's] freedom to testify or whether counsel gave him specific advice so unreasonable that it otherwise vitiated his knowing and intelligent decision not to testify." Commonwealth's Brief at 52. The Commonwealth also notes that, unlike in **Commonwealth v. Nieves**, 746 A.2d 1102 (Pa. 2000), "erroneous legal advice was not the sole reason informing [Appellant]'s ultimate decision not to testify." Commonwealth's Brief at 54. Instead, the Commonwealth contends that Attorney Amendola's overriding concern was allowing the prosecution to cross-examine Appellant. *Id.* The Commonwealth notes that Attorney Amendola could not have prevented the Commonwealth from asking questions about Matt Sandusky simply by limiting the scope of his direct examination. *Id.* at 55. The Commonwealth asserts that "[Appellant] himself could have easily opened the door to such a line of inquiry depending upon the answers that he provided . . ." *Id.*

The Commonwealth further argues that since the prosecution had already agreed not to call Matt Sandusky as a rebuttal witness, a motion to prevent him from testifying would have been unnecessary. *Id.* at 56. The Commonwealth also references Attorney Amendola's testimony at the PCRA hearing, in which he explained that a motion *in limine* "would have been subject to trial circumstances because the judge could not predict what was

going to be said if [Appellant] testified. And once [Appellant] testified, that could change whatever ruling the judge had made preliminarily." *Id.*

It is well settled that

[t]he decision of whether or not to testify on one's own behalf is ultimately to be made by the defendant after full consultation with counsel. In order to sustain a claim that counsel was ineffective for failing to advise the appellant of his rights in this regard, the appellant must demonstrate either that counsel interfered with his right to testify, or that counsel gave specific advice so unreasonable as to vitiate a knowing and intelligent decision to testify on his own behalf.

*Nieves*, 746 A.2d at 1104 (citations omitted). Additionally, "where a defendant voluntarily waives his right to testify after a colloquy, he generally cannot argue that trial counsel was ineffective in failing to call him to the stand." *Commonwealth v. Rigg*, 84 A.3d 1080, 1086 (Pa. Super. 2014) (citation omitted).

Instantly, at the evidentiary hearing on Appellant's PCRA petition, Attorney Amendola reiterated that he originally planned to call Appellant as a witness at trial. *See* PCRA Hr'g, 8/12/16, at 149. However, he explained that mid-way through trial, the Commonwealth advised defense counsel that Matt Sandusky had come forward with sexual abuse allegations against his father. *Id.* at 151. Attorney Amendola stated that although the Commonwealth eventually agreed not to use Matt Sandusky in their case-in-chief or as a rebuttal witness, the Commonwealth would not agree to abstain from cross-examining Appellant about Matt Sandusky. *Id.* Attorney Amendola stated "that's what made the whole deal blow up," and that he believed subjecting

Appellant to cross-examination regarding Matt Sandusky's allegations of abuse would be "too risky." *Id.*

The PCRA court found that Attorney Amendola's testimony was credible. The court further concluded that counsel's advice was proper and reasonable.

Additionally, the PCRA court determined that Appellant's decision not to testify was not based solely on the assertion that Matt Sandusky could be called as a rebuttal witness. *See* PCRA Ct. Op., 10/18/17, at 45. The PCRA court explained that

> [t]he threat of Matt [Sandusky]'s testimony was not the only downside they discussed, [Attorney Amendola] continued. In expounding on that answer, however, he implicitly confirmed that Matt was the driving force behind his advice that [Appellant] not testify. "But the point is . . . he would have been subjected to cross-examination generally, and in the course of that cross-examination generally, I was concerned, and I expressed my concern to [Appellant], that he could open the door quite easily to them getting Matt's testimony in," he explained. That result, he opined, would have been catastrophic. [Appellant], he added, agreed with that assessment.
>
> * * *
>
> Whether the Commonwealth called him as a rebuttal witness or was limited to cross-examining [Appellant], then, Matt Sandusky's allegations almost certainly would have reached the jurors' ears. [Attorney] Amendola did not want them to hear that his client's son had become an accuser, though, and neither did [Appellant]. They wanted to suppress that evidence—to forestall the jury from hearing the substance of Matt's accusations, not just his appearance on the witness stand. The only sure way to accomplish that was for [Appellant] not to testify. That was what Amendola accurately conveyed, and that was the ultimate consideration that convinced [Appellant] to waive his right to testify.

*Id.* at 46.

The PCRA court's conclusions are supported by the record. The evidence establishes that Appellant's decision not to testify was made after a full consultation with counsel, and was based on counsel's advice regarding the benefits and risks of testifying. That advice included the possibility that the Commonwealth would cross-examine Appellant regarding Matt Sandusky's allegations of abuse. Therefore, Appellant's decision not to testify was not based solely on erroneous advice that would render it unknowing or unintelligent, and the PCRA court did not err in concluding that counsel was not ineffective. Accordingly, no relief is due.[20] ***See Daniels***, 963 A.2d at 419.

> **13. Whether the [PCRA] court erred in finding counsel effective in declining to investigate juror bias, failing to procure an expert report that would have shown that a change of venue or venire or continuance was warranted, for not requesting a change of venue or venire or seeking a cooling off period and in neglecting to question the jurors specifically about the information they had learned from the media where one of the trial court's opening question to each juror conceded that due to the extensive media coverage the**

---

[20] Moreover, we find unavailing Appellant's claim that counsel was ineffective for failing to file a motion *in limine* to preclude Matt Sandusky from testifying or to limit the scope of cross-examination. The evidence establishes that the Commonwealth agreed not to call Matt Sandusky as a witness, so a motion to preclude him from testifying would have been immaterial. Additionally, even if Attorney Amendola had narrowly limited the scope of his direct examination, Appellant's responses could have nonetheless opened the door to questions about Matt Sandusky and expose the jury to allegations made by Appellant's son. Therefore, rather than expose Appellant to that risk, it was reasonable for Attorney Amendola to advise him not to testify.

> **juror had knowledge of highly prejudicial information[.]**

Appellant next argues that the PCRA court erred in rejecting his ineffectiveness claims related to Attorney Amendola's failures to (1) request a change of venue or seek a cooling off period; (2) procure an expert report that would have shown that a change of venue or continuance was warranted; (3) investigate juror bias; and (4) question jurors about their knowledge of the case. Appellant's Brief at 168.

Our Supreme Court has summarized the law in this area as follows:

> [T]he pivotal question in determining whether an impartial jury may be selected is not whether prospective jurors have knowledge of the crime being tried, or have even formed an initial opinion based on the news coverage they had been exposed to, but, rather, whether it is possible for those jurors to set aside their impressions or preliminary opinions and render a verdict solely based on the evidence presented to them at trial.

> Nevertheless, our Court has recognized that there are some instances in which pretrial publicity can be so pervasive and inflammatory a defendant does not have to prove actual prejudice. Prejudice will be presumed whenever a defendant demonstrates that the pretrial publicity: (1) was sensational, inflammatory, and slanted toward conviction, rather than factual and objective; (2) revealed the defendant's prior criminal record, if any, or referred to confessions, admissions or reenactments of the crime by the defendant; or (3) derived from official police or prosecutorial reports.

> However, if the defendant proves the existence of one or more of these circumstances, a change of venue will still not be compelled unless the **defendant also demonstrates that the presumptively prejudicial pretrial publicity was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, and that there was insufficient time between the publicity and the trial for any prejudice to have dissipated.** With respect to the determination of whether there has been an adequate cooling off

period to dissipate the effect of presumptively prejudicial media coverage . . . [a] court must investigate what a panel of prospective jurors has said about its exposure to the publicity in question.  This is one indication of whether the cooling period has been sufficient.  Thus, in determining the efficacy of the cooling period, a court will consider the direct effects of publicity, something a defendant need not allege or prove . . . .  **Normally, what prospective jurors tell us about their ability to be impartial will be a reliable guide to whether the publicity is still so fresh in their minds that it has removed their ability to be objective.  The discretion of the trial judge is given wide latitude in this area.**

*Commonwealth v. Bardo*, 105 A.3d 678, 713 (Pa. 2014) (citation omitted; emphases added).

### (a)  Change of Venue/Venire and Cooling-Off Period

Appellant contends that trial counsel was ineffective for failing to seek a change of venue or a cooling off period.  Appellant's Brief at 190.  In support, he argues that Appellant could not have had a fair trial in Centre County in 2012, and that "the fairness of all the jurors selected can be questioned since they all knew of the negative pre-trial publicity." *Id.*  Appellant continues that "empirical science and research conclusively demonstrate[] that no . . . questioning by a court can secure an unbiased jury in a case like [Appellant's,] absent an adequate change of venue or cooling period." *Id.*

The Commonwealth counters that each empaneled juror confirmed his or her ability to consider the evidence and render a verdict based upon that evidence alone.  Commonwealth's Brief at 136.  This, the Commonwealth asserts, is the proper inquiry in determining whether a change of venue/venire or a cooling-off period is necessary. *Id.*

The PCRA court concluded that trial counsel had a reasonable basis for declining to seek a change of venue or a cooling off period. The court explained that

> keeping the trial in Centre County was indeed the strategy upon which [Attorney Amendola] and [Appellant] had agreed. Consistent with what he had stated in response to the Commonwealth's motion to change venue or venire, he believed [Appellant] was just as likely to get a fair jury in Centre County as he was anywhere else in the country, and [Appellant] has not produced any evidence tending to indicate that his belief was unreasonable. That being the case, counsel had no reason to even consider filing a motion to change venue or venire or commissioning an expert report designed to support such a motion. He thus was not ineffective for failing to do so.
>
> [Attorney] Amendola also acted deliberately in not filing a motion to continue the trial until there had been a longer cooling-off period.
>
> [Attorney Amendola] was familiar with the "cooling-off" concept, as well as the relevant case law. It thus was not out of ignorance that he neglected to raise the issue, but because he felt certain that it would be to no avail. As he unhesitatingly explained at the PCRA hearing when asked whether he had requested a continuance based on the need for a cooling-off period, "I did not. And the reason I didn't, quite frankly, was because if we weren't getting continuances on all the other legitimate reasons that we had, we certainly weren't going to get it on that basis." Based on his many interactions with [the trial court], he was certain that such a request would have been denied on the basis that the jury selection process itself would reveal whether media saturation had in fact unduly prejudiced the jury pool. That was a reasonable assumption.
>
> As the record amply reflects, [the trial judge] took a no-nonsense approach from start to finish with respect to the management of these cases and was not inclined to delay the trial unless he deemed it to be absolutely necessary. He deemed it unnecessary, though, when [Attorney] Amendola learned just a month before jury selection that his jury consultant would be unavailable in June; when expert witnesses counsel expected to retain could not

accommodate a June trial; when potentially exculpatory lay-witnesses were unavailable while defending their own criminal charges; and when defense counsel received thousands of pages of discovery materials not long before jury selection was scheduled to commence. Nor was [the trial judge] persuaded to continue the trial when [trial] counsel, purporting to feel overwhelmed by existing developments, sought leave to withdraw from the case. In the midst of counsel's impassioned speech regarding his inability to adequately try the case, in fact, Judge Cleland announced, "This case has been on track for this trial date since at least January. It's no surprise to anybody. I never ever suggested or made any indication that there would be a continuance, except as requested by Judge Feudale and as a courtesy to him. I have never, I do not believe, misled or given any indication that I had any intention of scheduling this case except when it was scheduled and we're going to proceed."

In light of the foregoing, it is fanciful to suppose that [the trial judge] would have granted a continuance based on the allegation that a cooling-off period was necessary. In light of his position on the necessity of a jury consultant, moreover, it is fanciful to suppose that an expert report, even one indicating significant community bias against [Appellant], would have convinced him that the traditional *voir dire* process would be inadequate to weed out biased venire persons.

PCRA Ct. Op., 10/18/17, at 22-23.

Based on our review of the record, we agree with the PCRA court's conclusions, which are supported by the record. The evidence establishes that counsel made a tactical decision to remain in Centre County for trial. Specifically, counsel testified that because the trial was widely publicized throughout the state, he believed that Appellant's positive reputation in the community would be beneficial in selecting an impartial jury. Therefore, counsel had a reasonable strategic basis for his decision, and the PCRA court

did not err in concluding that counsel was not ineffective for pursuing that strategy.[21]  Accordingly, no relief is due.  ***See Daniels***, 963 A.2d at 419.

### (b)   Jury Expert

Appellant next alleges that trial counsel was ineffective for failing to retain a jury consultant.  Appellant's Brief at 172.  Specifically, he asserts that a jury expert would have assisted in "determining whether a jury could be selected in Centre County that did not have significant knowledge of highly prejudicial information."  ***Id.***  He concludes that had trial counsel procured a jury expert, the defense would not have opposed the Commonwealth's motion to change venire.  ***Id.***

The Commonwealth responds that Appellant has failed to establish how the outcome would have been any different had the defense been advised by a jury consultant.[22]  Commonwealth's Brief at 133.  Specifically, the Commonwealth argues that Appellant "clings to research done in connection

---

[21] Moreover, although the pre-trial publicity was far-reaching in Appellant's case, Judge Cleland gave no indication that he would grant a continuance for any reason.  ***See*** PCRA Ct. Op., 10/18/17, at 23 (referencing Judge Cleland's statement that "I never ever suggested or made any indication that there would be a continuance, except as requested by Judge Feudale and as a courtesy to him.  I have never, I do not believe, misled or given any indication that I had any intention of scheduling this case except when it was scheduled and we're going to proceed").  Therefore, it was reasonable for counsel to focus on strategies that he believed were more likely to produce favorable results for Appellant.

[22] The Commonwealth notes that trial counsel did request a continuance in order to hire jury consultant Beth Bochnak, who was unavailable because she was working on a murder trial.  ***See*** Commonwealth's Brief at 133.  However, the trial court denied trial counsels' request.  ***Id.***

with the Curley, Schultz, and Spanier cases by [Dr. Arthur H. Patterson]" despite the fact that "Dr. Patterson's survey actually undercuts [Appellant]'s position as it concluded that pre-trial publicity surrounding [Appellant's] case was unusually far-reaching and intense across the state." *Id.* The Commonwealth points out that defense counsel was already aware of that fact. *Id.* Therefore, the Commonwealth suggests that Appellant's "theory that Judge Cleland would have granted the change of venire if [Appellant] had joined in the Commonwealth's motion, and had presented the expert opinion of a jury consultant, simply strings together a series of hopeful assumptions." *Id.*

> The PCRA court addressed Appellant's claim as follows:
>
> Trial counsel asked the [trial court] more than once to continue the trial so that he could utilize the services of a jury consultant to help him select jurors untainted by the pretrial publicity these cases had garnered. [The trial judge] denied each request. Believing that the traditional *voir dire* process was adequate to identify any firmly held opinions and unacceptable biases, he was not convinced that a jury consultant was any more qualified than Attorney Amendola to select an appropriate jury.

PCRA Ct. Op., 10/18/17, at 22.

At the PCRA hearing, Appellant's PCRA counsel questioned Attorney Amendola about his decision to keep the case in Centre County. Attorney Amendola explained:

> I don't think it made a difference if we tried him in Timbuktu, [PCRA counsel]. His case was so well know[n], not only nationally, but across the entire continent where people speak English. I was getting calls from London, England, from Toronto, Ontario about [Appellant's] case. My philosophy was, and [Appellant] and I

- 75 -

discussed this, we discussed the jury issue, whether we should agree that there should be an out-of-county jury. And [Appellant] and I discussed the issues. And we came to the conclusion jointly, after discussing those issues many times if not here, where? In other words, where in the world were we going to go to get a jury that hasn't heard about his case? And if not our citizens in Centre County, who? What other citizens are going to give him a fair trial?

PCRA Hr'g, 3/24/17, at 47-48.

At the outset, we note that trial counsel attempted to retain a jury consultant, but that the trial court denied their request for a continuance. Moroever, Appellant has failed to establish the existence of a jury consultant who was willing and able to provide a review within the timeframe established by the trial.

In any event, based on our review of the record, we agree with the Commonwealth's assertion that Appellant has not established that hiring a jury consultant would have changed the outcome of the case, nor would it have altered counsel's strategy to try the case in Centre County. Attorney Amendola was fully aware that the case was widely publicized throughout the state, and he specifically referenced that fact in explaining his decision to remain in Centre County. *See id.* at 47-48. Therefore, the PCRA court did not err in concluding that counsel was not ineffective for failing to procure an expert consultant. Accordingly, we conclude that no relief is due. *See Daniels*, 963 A.2d at 419.

**(c) Voir Dire**

Appellant also contends that counsel had no reasonable basis for failing to question prospective jurors about the specific information they learned about Appellant's case from the media. Appellant's Brief at 193. He argues that the surrounding media coverage contained "highly prejudicial and damaging evidence," and posits that counsel should have specifically asked each juror if they had read the grand jury presentments, and whether they had "read stories placing blame for the firing and death of Joe Paterno on [Appellant]." *Id.* Appellant claims that counsel's failure to question jurors about their specific knowledge of the case "resulted in the selection of jurors that, despite any statements to the contrary, could not fairly consider the evidence." *Id.*

The PCRA court explained that:

In addition to seeking the aid of a jury consultant, [Attorney] Amendola filed a motion requesting individual *voir dire* as part of his Omnibus Pre-Trial Motion. He also sought permission to have the prospective jurors complete supplemental questionnaires based on his concern that they would be reticent to honestly disclose in a public setting information that could reveal prejudices. It is unclear from the record whether Judge Cleland authorized the latter measure. It is clear, however, that he conducted individual *voir dire* with the same concern in mind, taking each prospective juror into his chambers, along with counsel, two pool reporters, and a member of the public, and advising each one that he would excuse the latter three if he or she did not wish to answer questions in their presence.

* * *

Additionally, as much as [Appellant] would like to rely on academic concepts like "presumptive bias" to suggest that [Attorney] Amendola had a duty to delve further into what the jurors in this case had read, the courts of this Commonwealth generally adhere

- 77 -

to the principle that jurors are capable of the introspection necessary to evaluate their own biases. Accordingly, courts will measure the continuing effects of pretrial publicity by reference to the jurors' answers. **Commonwealth v. Robinson**, 864 A.2d 460 (Pa. 2004). "Normally," says the Court, "what prospective jurors tell us about their ability to be impartial will be a reliable guide to whether the publicity is still so fresh in their minds that it has removed their ability to be objective." **Id.** at 484 (internal citations omitted). As the transcripts reflect, each empaneled juror in this case confirmed his or her ability to consider what was presented at trial and render a verdict based on that evidence alone.

PCRA Ct. Op., 10/18/17, at 22-25.

Based on our review of the record, we agree with the PCRA court that the potential for juror partiality in relation to the media coverage of the case was sufficiently addressed during the individually conducted *voir dire*. **See id.** at 22. Therefore, Appellant's claim fails for lack of arguable merit. **See Daniels**, 963 A.2d at 419.

### (d) Juror Bias

Appellant next claims that counsel was ineffective for failing to challenge the empanelment of biased jurors. Appellant's Brief at 192. Specifically, he refers to (1) Juror 5692, a Penn State University student who stated that he "heard everything" with respect to media coverage of the case; and (2) Juror 3208, a retired bus driver who "had strong feelings about protecting kids and did not want to see children hurt" and "indicated that 'she probably could be fair.'" **Id.** Empanelment of these two jurors, Appellant claims, demonstrates that his claims of juror bias have merit. **Id.**

- 78 -

The Commonwealth counters that each of the empaneled jurors "confirmed his or her ability to consider the evidence and render a verdict based upon that evidence," and therefore, Appellant has failed to demonstrate that juror bias influenced the verdict. Commonwealth's Brief at 136.

The PCRA court addressed Appellant's claim as follows:

As the transcripts reflect, each empaneled juror in this case confirmed his or her ability to consider what was presented at trial and render a verdict based on that evidence alone. That included the two [Appellant] referenced as evidencing juror bias.

Despite being a student who had "heard everything," Juror No. 5692, after answering a couple of questions in a seemingly ambiguous manner, affirmed unequivocally that he could be fair and impartial. Both the [c]ourt and [Attorney] Amendola satisfied themselves in that regard with the following exchanges:

> **MR. AMENDOLA:** Have you reached any personal decisions about whose fault it is that Penn State has really been hit hard by what's happened with [Appellant]?
>
> **JUROR NO. 5692:** Who single-handed, like, who's [sic] overall fault? I think there's a lot of people involved. I think everyone had a little piece of everything. I don't think there's anyone. Like, overall that was completely to blame. Do I think [Appellant] did a few things that he shouldn't have? I guess. I think everyone just kind of underestimated a lot of things and—
>
> **MR. AMENDOLA:** But by what you are telling us, are you really telling us that you have already determined that something happened that shouldn't have happened and so everyone kind of shared on the blame for the charges that were later filed?
>
> **JUROR NO. 5692:** I'm saying I know what I have read and—not even know. I understand what I have read and that's all I know. And I can—look, I said I read, you know. I have read a little bit of everything and that's all that I - I don't know. I can't say they're my opinions because they're obviously somebody else's. Somebody else wrote it down

and I read it because I was interested in it.  But that's—I guess that's all I'm saying.

**MR. AMENDOLA:** Could you put everything that you have read aside and listen to the judge who would instruct you, you can only consider the evidence that you'll hear at trial and based upon that evidence and the [c]ourt's instructions make a decision not on what you heard before today or even before next Monday [but] what you hear at trial?  Could you live by that instruction?

**JUROR NO. 5692:** Yeah.

**THE COURT:** Okay.  If you are selected as a juror, you would have to take an oath in which you would agree to decide the case based only on what you heard in the courtroom and put aside everything else that you heard.

**JUROR NO. 5692:** Um-hum.

**THE COURT:** There's a lot riding on that answer.

**JUROR NO. 5692:** Yeah.

**THE COURT:** Can you do that or do you have some reservations?

**JUROR NO. 5692:** Yeah.  I mean, there's—I don't think there would be a reason for me to believe anything truer than what I would hear in the courtroom anyway so.

**THE COURT:** Your answer is yes?

**JUROR NO. 5692:** Yes.

Similarly, while Juror No. 3208 expressed a general concern for the welfare of children and sprinkled her answers with all-too-common qualifiers like "probably" and "I guess," her responses to Judge Cleland's and [Attorney] Amendola's clarifying questions disannulled her seeming uncertainty.  It is likewise telling that counsel, who had the opportunity to observe Juror No. 3208's demeanor and hear the vocal inflections indiscernible from the pages of a transcript, accepted her without reservation. [Appellant] did not allege any other specific instances of bias among the members of his jury, and as the Court has already indicated, his reliance on "presumptive bias" is unavailing[.]

PCRA Ct. Op., 10/18/17, at 26.

Based on our review of the record, we discern no basis to disagree with the PCRA court that Appellant has failed to establish juror bias and did not demonstrate that the alleged biases affected the outcome of his case. ***See id.*** Therefore, Appellant's ineffective assistance of counsel claim fails. ***See Daniels***, 963 A.2d at 419.

**14. Did the [PCRA] court err in determining [Attorney] Amendola performed effectively in waiving [Appellant]'s preliminary hearing?**

Appellant next focuses on Attorney Amendola's advice that Appellant waive preliminary hearings. Appellant's Brief at 216. Appellant notes that Attorney Rominger disagreed with the waiver of a preliminary hearing.[23] Appellant further cites to his own testimony that Attorney Amendola did not discuss the advantages of conducting a preliminary hearing. ***Id.*** at 221. Appellant further suggests that Attorney Amendola's advice was unreasonable because his belief that Appellant's bail would be increased after the filing of new charges was speculative and because Appellant did not receive any of the expected benefits of his waiver while free on bail. ***Id.*** at 225 & n.35. Appellant further argues that because there was no hearing, trial counsel was "inadequately prepared," in that the defense did not have the benefit of

---

[23] Appellant's argument contains non-legal citations, including a Huffington Post article written by Attorney Rominger after trial in which he opined that there should have been a preliminary hearing.

hearing witness testimony or gathering statements to use for impeachment at trial.[24]  *Id.* at 220.

The Commonwealth responds that the PCRA court properly concluded that Appellant's claim of prejudice was speculative because there was no indication that a preliminary hearing would have produced additional inconsistent statements by the victims.  Commonwealth's Brief at 151.  In support, the Commonwealth relies on ***Commonwealth v. McBride***, 570 A.2d 539 (Pa. Super. 1990).[25]  The Commonwealth further argues that Attorney

---

[24] To the extent Appellant argues that he was prejudiced because the charges against Victim 8 were based solely on hearsay and would have been dismissed at the preliminary hearing, we agree with the PCRA court's conclusion that the issue is waived.  Appellant's second amended petition, which contained this issue, makes no mention of this additional argument.  ***See*** Second Am. PCRA Pet., 3/7/16, at 82-85.

[25] In ***McBride***, the defendant argued that trial counsel was ineffective for waiving his preliminary hearing, in that "his defense was hampered because he had not previously heard the Commonwealth's witnesses testify."  ***Id.*** at 541.  The ***McBride*** Court rejected the defendant's argument, concluding that such a claim

> is too general to entitle [the defendant] to relief.  "Counsel will not be found ineffective in a vacuum, and we will not consider claims of ineffectiveness without some showing of a factual predicate upon which counsel's assistance may be evaluated." ***Commonwealth v. Thomas***, . . . 539 A.2d 829, 837 ([Pa. Super.] 1988).  In the absence of a more specific allegation regarding the prejudice suffered by appellant due to the waiver of a preliminary hearing, we find no basis upon which to find trial counsel ineffective with respect thereto.

*Id.* (citations omitted).

Amendola stated a reasonable basis for advising Appellant to waive a preliminary hearing. Commonwealth's Brief at 151.

Instantly, the PCRA court concluded that Attorney Amendola was not ineffective for waiving a preliminary hearing, explaining:

[a]s his preliminary hearing date approached, [Appellant] was out on $250,000.00 bail—an amount the family struggled to post. He did not want to be in jail, and [Attorney Amendola] did not want him there, either. Well aware of the restrictions inherent to incarceration, in fact, Amendola thought it critical that [Appellant] remain at home, where he would be better able to help prepare his defense. Knowing that the Commonwealth had what it needed to file new charges and ask for a bail increase, therefore, counsel deemed it prudent to see whether he could prevent [Appellant]'s re-incarceration. He began by contacting [Prosecutor] McGettigan to inquire whether he would be willing to forego requesting additional bail on any new charges in exchange for [Appellant] waiving his preliminary hearing. Amendola knew, after all, that he could not use that proceeding to attack the witnesses' credibility or explore their motives, but that it would provide the Commonwealth with yet another opportunity to publicize its side of the story, including "all the gruesome details of the accusers."

Within a day or two of speaking with [Prosecutor] McGettigan, who was willing to consent to the terms of the proposal, [Attorney] Amendola discussed the matter with [Appellant]. He explained the pros and cons of both options, including that waiver would mean losing the right to question the accusers, and advised [Appellant] to waive the hearing. As of December 12, 2011—the day before the hearing—[Appellant] was in agreement with [Amendola] and did not change his mind. On the contrary, [Appellant] called [Amendola] after the post-waiver press conference to express his delight over "finally see[ing] our side getting out."

It was not out of ignorance that [Attorney] Amendola advised [Appellant] to waive the hearing, either. [Amendola] knew the witnesses' credibility would be a crucial concern at trial and that he was forfeiting the opportunity to observe and cross-examine them ahead of time. He also knew that their statements would be divulged through the agreed-upon expedited discovery,

however, and did not anticipate that their preliminary hearing testimony would differ materially from what they had already disclosed. He did anticipate that the Commonwealth would make a successful bid for a bail increase if it filed additional charges, however—an increase permitted by Rule 523 and which experience told him was a 99.9% probability. In his estimation, therefore, the potential benefits of demanding a preliminary hearing were outweighed by the guaranteed benefits of waiving it. That was an entirely reasonable calculation that precipitated an entirely reasonable response.

PCRA Ct. Op., 10/28/17, at 14-15.

We agree with the PCRA court's conclusions, and they are supported by the record. Initially, we note that Appellant's assertions that Attorney Amendola failed to advise him of the possible benefits of a preliminary hearing rely solely on his own testimony, which was contradicted by Attorney Amendola's testimony at the PCRA hearing. *See* PCRA Hr'g, 8/12/16, at 133. Further, we agree with the PCRA court that Attorney Amendola articulated a reasonable basis for advising Appellant to waive his preliminary hearing, in that "it was critical to our defense that [Appellant] not be incarcerated."[26] *Id.*

---

[26] Appellant also references the fact that there was an out-of-court conference with counsel, a magisterial district judge, and the trial judge held before Appellant waived his preliminary hearing. *See* Appellant's Brief at 225. In an attempt to bolster his claim, Appellant cites to *Commonwealth v. Evans*, 252 A.2d 689, 690 (Pa. 1969) (holding that a judge must not participate in the plea-bargaining process). Appellant suggests that Judge Cleland's presence during waiver discussions was comparable to a judge participating in plea negotiations.

Although such a conference was unusual, Appellant presented no evidence that the magisterial district judge or the trial judge's participation in the conference coerced his decision to waive a preliminary hearing or tainted

at 121-22.   Therefore, Appellant has failed to establish that Attorney Amendola lacked a reasonable basis for advising Appellant to waive a preliminary hearing at the time that decision was made.   Lastly, Appellant failed to establish that he suffered any prejudice beyond his assertion that the hearing would have provided additional impeachment material or further evidence of repressed memory therapy.  ***See McBride***, 570 A.2d  at 541. Accordingly, no relief is due.

> **15. Whether the [PCRA] court erred in concluding counsel [was] effective for failing to file a motion to quash the grand jury presentment and the charges arising therefrom relative to Victims 2 through 10 based on governmental misconduct in tainting the grand jury process[.]**

Appellant next alleges that trial counsel was ineffective for failing to file a motion to quash the grand jury presentment based on suspected grand jury leaks.  Appellant's Brief at 231.  Appellant argues that the OAG engaged in governmental misconduct in order to strengthen the case against Appellant. Specifically, Appellant claims that the OAG provided information to reporter Sara Ganim, who wrote an article about the investigation in March of 2011, several months before its official release in November of 2011.  Appellant also asserts that the OAG was responsible for improperly placing the grand jury presentment online prior to its official release.

---

Attorney Amendola's reasonable belief that a waiver was best suited to advance Appellant's interests.

Appellant argues that Attorney Amendola had no reasonable basis for failing to pursue a motion to quash, as the reason for his decision was "that [Prosecutors] Fina and McGettigan assured him that there were no leaks," which was unreasonable given the allegation that "those individuals were members of the very governmental team alleged to have leaked the information." *Id.* at 240. Appellant argues that he suffered prejudice because the leaked information led to S.P., R.R., and Ronald Petrosky coming forward as witnesses. *Id.* at 241. Additionally, Appellant argues that "the leaks also allowed an opportunity for those individuals who did become accusers to alter their story to better fit the narrative." *Id.*

Appellant also claims that "[t]he prosecution told McQueary in advance that the presentment would be leaked." *Id.* Appellant concludes that counsel was aware of this information, and therefore should have filed a motion to quash based on suspected grand jury leaks. *Id.* at 240. Finally, Appellant argues that the PCRA court erred by denying counsel's request to call Ganim as a witness. *Id.* at 243.

This Court has previously stated:

When addressing a claim of prosecutorial misconduct before a grand jury, our federal courts look first to see whether the alleged misconduct took place, and next, to whether any sanction, such as dismissal of the indictment or suppression of the evidence, is warranted. When dismissal is the requested relief, the federal courts take one of two approaches. The first approach finds dismissal proper where the defendant can show that the conduct of the prosecution caused him prejudice. Prejudice will have occurred only "'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave

doubt' that the decision to indict was free from the substantial influence of such violations." Under the second approach, dismissal may be proper where no actual prejudice is shown "if there is evidence that the challenged activity was something other than an isolated incident unmotivated by sinister ends, or that the type of misconduct challenged has become 'entrenched and flagrant' in the circuit." Under either approach, we must first determine whether any misconduct occurred.

*Commonwealth v. Williams*, 565 A.2d 160, 163-64 (Pa. Super. 1989) (citations omitted).

The PCRA court explained that

Because this question was one of the original eleven issues Judge Cleland designated for hearing, PCRA counsel questioned several witnesses about it and subsequently briefed the matter. Judge Cleland did not permit the defendant to call Sarah Ganim ("Ganim"), however, and ultimately dismissed the issue with the promise of a forthcoming opinion. Order, 10/17/2016, at 3. He then recused himself before having the opportunity to explain his decision, and this jurist declined to overrule his dismissal, though it did allow the parties to submit additional documentation in support of or opposition to the claim. Taken together, that evidence reveals that there is no merit to the underlying claim of prosecutorial misconduct. [Attorney Eshbach] and [Prosecutor] Fina served as the Commonwealth's primary representatives throughout the grand jury proceedings, and both were questioned at the PCRA hearing. Eshbach said she was aware of the Ganim article[27] and discussed how she and Fina had set an internal trap to determine whether the journalist's information had come from someone in the Attorney General's Office. She knew she was not Ganim's source. Fina knew the same thing about himself and was certain the leak had not come from the agents who delivered the presentment to the district judge's office. Like Eshbach, though, he could not identify the source. He knew the leak was a problem, though. He knew it in 2016, and he knew it in 2011, when he asked Judge Feudale, the supervising judge over the grand jury, to investigate the matter. Because he suspected that the grand

---

[27] The "Ganim article" refers to a March 2011 article written by Sara Ganim that indicated that Appellant was under investigation.

jury presentment may have been purposely leaked by the district justice or a member of his staff, moreover, the assistant prosecutor reported his concerns to the Judicial Misconduct Board for further investigation.

It was Agents Feathers and Sassano, now a director with the Attorney General's Office, who both delivered the presentment to the district justice's office and investigated how it had gotten prematurely published. (*Id.* at 43-45). [Appellant] did not call Feathers to testify, though, and only asked Sassano whether he was aware of the Ganim article; he did further inquire about what information the former agent had about the leaks. (*See id.*, 08/22/2016, pp. 90-93). Counsel for the Attorney General's Office did, though, and Sassano said he had no knowledge of anybody leaking information. (*Id.* at 114-16).

Corporals Scott Rossman ("Rossman") and Joseph Leiter ("Leiter") (retired) also answered questions about the leaks, including whether they knew how Ganim had gained access to non-public information pertaining to the 2008-2009 investigation regarding [A.F.] and a 1998 investigation involving a young man by the name of [Z.K.]. Neither was able to name Ganim's source, though Rossman suggested an array of persons who would have had access to information about the [Z.K.] matter. Similarly, Eshbach readily named various individuals and entities who would have known about the [A.F.] investigation, as did Michael Gillum ("Gillum"), the psychologist who counseled with [A.F.] after his abuse.

The testimony, then, did not support the idea that the prosecution leaked grand jury information for any reason, let alone for the purpose of generating more victims. If anything[,] it supports the opposite conclusion, because while someone might be skeptical about the validity of Eshbach and Fina's internal "trap," it is a fact of human nature that one engaged in or aware of misconduct he does not wish to have exposed does not ask an outside source to investigate it. As the man in charge at that time, however, Fina was actively seeking assistance from Judge Feudale and the Judicial Misconduct Board to ascertain the source(s) of the problem.

\* \* \*

On June 17, 2017, pursuant to its earlier order and discussions held at sidebar, the [c]ourt admitted into evidence the transcribed testimony of Michael McQueary . . . whose testimony helped to secure [Appellant's] conviction relative to Victim #2 and who later testified as a Commonwealth's witness in the case of ***Commonwealth v. Graham Spanier***. "Mr. McQueary's testimony," [Appellant] proffered, "was that he had been alerted that the [Office of Attorney General] was going to leak the grand jury presentment." In support thereof, he quoted the following portion of the transcript: "I was on my way to Boston for recruiting and I was in going from F terminal over [to] the B terminals over in Philadelphia Airport. And there was one of those little trams. The [Attorney General]'s called and said we're going to arrest folks and we are going to leak it out[.]" ***Id.*** [(emphasis omitted]); (PCRA, 05/11/2017, Ex[]. H, p. 24). Those words, though, had nothing to do with grand jury leaks. When he gave the above-quoted testimony, McQueary was responding to questions about [Appellant]'s arrest and nothing else—a fact that is apparent once the excerpt is put back into its original context.

\* \* \*

Not only did the "leak" McQueary mentioned have nothing to do with the grand jury, in fact, but the prosecutor made no mention of that tribunal during his direct examination, and McQueary did not bring it up, either. Nor did it come up in his cross- or re-direct examination. That being the case, McQueary's statement does nothing to validate [Appellant]'s allegation that the Attorney General's Office leaked secret grand jury information. Save for the McQueary transcript, Judge Cleland was in possession of the same factual record, and because it bore no evidence of the sort of prosecutorial misconduct that would support quashing the presentment or dismissing any of the charges, he appropriately dismissed this PCRA claim.

\* \* \*

As a corollary, the fact that Ganim, was exempt from testifying pursuant to the Shield Law, 42 Pa.C.S. [§] 5942, means that Judge Cleland did not err in ruling on the issue without first requiring her to testify. Regardless of what a Superior Court judge may have indicated in a concurrence or was alluded to by our high court in a footnote, a majority of our Supreme Court stated plainly

and unequivocally in ***Castellani v. Scranton Times, L.P.***, 956 A.2d 937 (Pa. 2008), "[W]e reaffirm that the Shield Law prohibits the compelled disclosure of a confidential source's identity, or any information which could expose the source's identity." ***Id.*** at 954. Because ***Castellani*** is binding on every Pennsylvania court below it, no trial court judge, whether Judge Cleland or this jurist, has the authority to ascribe precedential status to a footnote when doing so would contradict the Court's clear holding.[fn1]

> [fn1] [Appellant] indicates that Judge Cleland was prepared to compel Ganim to testify and reveal her source if PCRA counsel could establish that quashal was an appropriate remedy for a grand jury leak. Even assuming that he had determined otherwise, though, it is clear from the record that Ganim would not have testified. When [Attorney] Amendola wanted to call her at trial simply to authenticate the newspaper article she wrote and an e-mail she sent to one of the victim's mothers, she took the position that she would go to jail rather than risk being forced to answer questions about her source. That being the case, [Appellant] was not prejudiced by the inability to call Ganim as a PCRA witness even if Judge Cleland was mistaken as to the availability of quashal as a remedy in the event of prosecutorial misconduct.

This [c]ourt would note, moreover, that neither the Superior Court concurrence nor the Supreme Court's footnote actually purports to allow a criminal defendant to overcome the Shield Law in order to discover the source of a grand jury leak he believes disadvantaged him. Rather, the scenario addressed in footnote 14, which parallels the scenario envisioned by then-Judge Todd, now Justice Todd in her concurrence, is one in which the Commonwealth was seeking to compel a source's identity for the purpose of pursuing a criminal investigation or prosecution of the source of the leak. ***See id***[**.**], n. 14. [Appellant], of course, is not the Commonwealth, and facilitating a criminal investigation or prosecution of Ganim's source is not his aim. Accordingly, even assigning precedential value to the footnote would not salvage [Appellant's] meritless claim.

[Attorney] Amendola was correct, therefore, when he indicated that he had no basis for filing a motion to quash or similar motion. Aware of the possibility of governmental misconduct, he requested discovery materials related to whether the leaks had come from any government employee and was advised that none existed. He

did not have any evidence to the contrary, and, as the PCRA record indicates, would not have found any. As he said, therefore, "It would have been a blind motion without any substance to it." He thus was not ineffective for failing to file it, not only because he employed a reasonable strategy based on his knowledge of the law, but because "[c]ounsel is not required to perform a useless act or file a meritless motion." **Commonwealth v. Thomas**, 539 A.2d 829, 831 (Pa. Super. 1988). Even with the addition of McQue[a]ry's testimony, therefore, the record indicates quite plainly that Judge Cleland did not err in dismissing [Appellant's claim].

PCRA Ct. Op., 10/18/17, at 6-10.

Based on our review, we agree with the PCRA court's findings of fact and conclusions of law. The PCRA court found that there was no merit to Appellant's claim that the purported grand jury leaks were the result of prosecutorial misconduct. Moreover, we agree with the PCRA court's conclusion that an attempt to circumvent Pennsylvania Shield Law on this basis would have been unsuccessful. Accordingly, counsel was not ineffective for failing to pursue a meritless claim. **See Daniels**, 963 A.2d at 419.

> **16. Whether the [PCRA] court erred in finding counsel [was] effective in not seeking to quash the grand jury presentment and finding that the grand jury had subject matter jurisdiction in derogation of the plain language, intent, and history of the Grand Jury Act[.]**

Appellant also asserts that the PCRA court erred in concluding that a grand jury had subject matter jurisdiction to investigate the initial allegations of sexual abuse against Appellant. Appellant's Brief at 250. By way of background, on May 1, 2009, the OAG submitted a Notice of Submission of Investigation No. 29 (Notice 29) to the Thirtieth Statewide Investigating Grand

Jury.  *See* Notice 29, 5/1/09, at 1.  In accordance with the requirements of the Investigating Grand Jury Act, Notice 29 explained the nature of the investigation and why the OAG believed the investigative resources of a grand jury were necessary.  *See* 42 Pa.C.S. § 4544.  Notice 29 stated that

> [t]he Pennsylvania State Police are pursuing an investigation based upon a founded Clinton County Children and Youth Services complaint alleging sexual assault by a Centre [C]ounty adult male upon a juvenile male with whom he became acquainted through his sponsorship of a charity for disadvantaged youth.  It is believed that other minor males have been similarly assaulted through this connection.  The investigation concerns allegations of involuntary deviate sexual intercourse, indecent assault, and corruption of minors in Clinton and Centre [C]ounties.  The powers of the grand jury are needed in order for the investigation of this matter to advance to a satisfactory conclusion.  In particular, the power of the grand jury to compel the attendance of witnesses is needed.  Witnesses with knowledge may be too embarrassed or intimidated to admit their knowledge of the violations because the actor is well-regarded and influential and is also known as the founder of a charity that raises funds for and serves disadvantaged children.  Young men who are potentially involved are in fear of revealing what they know due to the suspect's power and influence.
>
> The power of the grand jury to compel testimony under oath is needed.  It is critical in a sexual assault case where no physical evidence exists to test the reliability of information provided by the witness and to obtain testimonial evidence which could be used at a criminal trial as substantive evidence if the witness testifies differently at trial.  *See Commonwealth v. Lively*, . . . 610 A.2d 7 ([Pa.] 1992).
>
> The power of the grand jury to subpoena documents is needed in order to obtain information that would not otherwise be available.  Specifically, telephone records and business records may be needed to corroborate the testimony of the witnesses.

*See* Notice 29, ¶ 3. On May 5, 2009, the supervising grand jury judge accepted the submission and the investigation of Appellant was designated Notice No. 29 in the Thirtieth Statewide Investigating Grand Jury.

The term of the Thirtieth Statewide Investigating Grand Jury expired following the testimony of Paterno, Schultz, and Curley, but before it issued a recommendation as to the charges against Appellant. On January 27, 2011, the OAG submitted the investigation to the Thirty-Third Statewide Investigating Grand Jury, which submission was accepted by the supervising grand jury judge on January 28. Also on January 28, grand jury subpoenas were issued to, among others, The Second Mile and the Centre County Office of Children and Youth Services (Centre County CYS) for records related to Appellant.

Appellant argues that pursuant to Section 4542 of the Grand Jury Act, 42 Pa.C.S. §§ 4541-4553, the jurisdiction of a multicounty grand jury is limited to investigations that involve either organized crime or public corruption. Appellant's Brief at 250. Therefore, Appellant claims that because the allegations against Appellant involved neither public corruption nor organized crime, the Thirtieth Statewide Investigating Grand Jury had no jurisdiction, and Attorney Amendola should have filed a motion to quash. *Id.* Appellant does not explicitly claim that the grand jury was improperly impaneled. Rather, he argues that the grand jury was "improperly impaneled to investigate [Appellant]." *Id.* at 253. Appellant further asserts that the investigation conducted by the Thirtieth Statewide Investigating Grand Jury

was "used as the basis for the grand jury presentment" by the Thirty-Third Statewide Investigating Grand Jury.[28]

The Grand Jury Act provides, in relevant part:

### § 4542. Definitions

The following words and phrases when used in this subchapter shall have, unless the context clearly indicates otherwise, the meanings given to them in this section:

* * *

**"Multicounty investigating grand jury."** A Statewide or regional investigating grand jury convened by the Supreme Court upon the application of the Attorney General and having jurisdiction to inquire into organized crime or public corruption or both under circumstances wherein more than one county is named in the order convening said investigating grand jury.

**"Organized crime."** The unlawful activity of an association trafficking in illegal goods or services, including but not limited to gambling, prostitution, loan sharking, controlled substances, labor racketeering, or other unlawful activities; or any continuing criminal conspiracy or other unlawful practice which has as its objective:

(1) large economic gain through fraudulent or coercive practices; or

(2) improper governmental influence.

**"Public corruption."** The unlawful activity under color of or in connection with any public office or employment of:

(1) any public official or public employee, or the agent of any public official or public employee under color of or in connection with any public office or employment; or

---

[28] Appellant does not separately challenge the jurisdiction of the Thirty-Third Statewide Investigating Grand Jury.

(2) any candidate for public office or the agent of any candidate for public office.

42 Pa.C.S. § 4542.

## § 4544. Convening multicounty investigating grand jury

**(a) General rule.--**Application for a multicounty investigating grand jury may be made by the Attorney General to the Supreme Court. In such application the Attorney General shall state that, in his judgment, the convening of a multicounty investigating grand jury is necessary because of organized crime or public corruption or both involving more than one county of the Commonwealth and that, in his judgment, the investigation cannot be adequately performed by an investigating grand jury available under section 4543 (relating to convening county investigating grand jury). The application shall specify for which counties the multicounty investigating grand jury is to be convened. Within ten days of receipt of such application, the court shall issue an order granting the same. Failure by an individual justice to grant such application shall be appealable to the entire Supreme Court.

42 Pa.C.S. § 4544(a).

## § 4548. Powers of investigating grand jury

**(a) General rule.--**The investigating grand jury shall have the power to inquire into offenses against the criminal laws of the Commonwealth alleged to have been committed within the county or counties in which it is summoned. Such power shall include the investigative resources of the grand jury which shall include but not be limited to the power of subpoena, the power to obtain the initiation of civil and criminal contempt proceedings, and every investigative power of any grand jury of the Commonwealth. Such alleged offenses may be brought to the attention of such grand jury by the court or by the attorney for the Commonwealth, but in no case shall the investigating grand jury inquire into alleged offenses on its own motion.

42 Pa.C.S. § 4548(a).

**§ 4550.  Submission of investigations by attorney for the Commonwealth to investigating grand jury**

**(a)    General rule.--**Before submitting an investigation to the investigating grand jury the attorney for the Commonwealth shall submit a notice to the supervising judge.  This notice shall allege that the matter in question should be brought to the attention of the investigating grand jury because the investigative resources of the grand jury are necessary for proper investigation.  The notice shall allege that one or more of the investigative resources of the grand jury are required in order to adequately investigate the matter.

42 Pa.C.S. § 4550(a).

Once a grand jury is properly impaneled, "the purpose for which a grand jury is convened does not restrict the grand jury from investigating actions which constitute criminal activity or probable violations of the criminal laws of the Commonwealth." *Commonwealth v. McCauley*, 588 A.2d 941, 945 (Pa. Super. 1991) (citation omitted); *see also In re Twenty-Fourth Statewide Investigating Grand Jury*, 907 A.2d 505, 512 (Pa. 2006) (stating that the Grand Jury Act "does not require that every matter submitted to a multi-county or statewide investigating grand jury needs to independently meet each one of the criteria that are threshold to the convening of the investigative body in the first instance," as the statutory requirements relative to the empaneling of a statewide investigating grand jury and the statutory powers of the grand jury to inquire into criminal offenses once empaneled are different).  "Rather, all that need be alleged in an application for submission of an investigation to any grand jury, county or multi-county, is that the matter in question requires the investigative resources of the grand jury."

*Commonwealth v. Atwood*, 601 A.2d 277, 281 (Pa. Super. 1991) (citing to 42 Pa.C.S. § 4550.)

Instantly, the record demonstrates that the Commonwealth complied with the statutory requirements for submitting the investigation to the Thirtieth Statewide Investigation Grand Jury. Specifically, the Commonwealth requested the investigative resources of the grand jury, noting that it was necessary to compel the attendance of witnesses and ensure confidentiality. *See* Notice 29, ¶ 3. Therefore, the Commonwealth and the grand jury were within their statutory authority to initiate an investigation into the allegations concerning Appellant. *See Atwood*, 601 A.2d at 281. Therefore, we agree with the PCRA court that Appellant's assertion lacks merit and that trial counsel could not be ineffective for failing to pursue a meritless claim. *See Daniels*, 963 A.2d at 419.

> **17. Did the [PCRA] court err in finding counsel [] effective in eliciting inculpatory evidence against [Appellant] and opening the door for the Commonwealth to introduce additional rebuttal evidence by presenting Dr. Elliot Atkins?**

Appellant claims that trial counsel was ineffective for presenting testimony from Dr. Elliot Atkins, which opened the door for the Commonwealth to present expert evidence from Dr. O'Brien in rebuttal.

By way of background, the PCRA court explained:

On the first day of trial, the Commonwealth introduced letters [Appellant] had written to [Victim 7, B.H.] that read like missives one would compose to his love interest. [Attorney] Amendola knew they would be part of the evidence and, recognizing that [Appellant]'s behavior with kids seemed odd to many people,

wanted the jury to hear from an expert that the psychology behind his anomalous conduct had nothing to do with pedophilia. He thus called Dr. Elliott Atkins solely to explain the letters, not to disestablish specific intent to commit the alleged crimes.

Establishing for the jury the intended parameters of Dr. Atkins' testimony, Judge Cleland prefaced it with the [following]: "The purpose of this testimony . . . is to offer an explanation concerning the letters which you had previously seen projected onto the screen." He further explained that the doctor was not attempting to rebut the evidence or excuse any criminal conduct and reiterated, stating "So this is offered for a very limited purpose, simply to explain the letters and the motivation of [Appellant] in writing the letters." Dr. Atkins then detailed the characteristics of histrionic personality disorder—the psychological condition with which he had diagnosed [Appellant]—and explained how the tone and content of the subject letters was consistent with that diagnosis.

Based on Dr. Atkins having discussed in general the traits of histrionic personality disorder, [Prosecutor] McGettigan and [Prosecutor] Fina [] argued that his testimony functioned to negate criminal intent and, therefore, that [Appellant] had opened the door to a broader inquiry into his sexual behavior. Judge Cleland rejected that argument but agreed that the Commonwealth could inquire about whether the same traits defining histrionic personality disorder were also characteristic of certain psychosexual disorders.

During cross-examination, Dr. Atkins acknowledged the diagnostic overlap. He clarified, however, that he had not seen evidence to support a psychosexual diagnosis. "There is no clear pattern or clear diagnosis of a psychosexual disorder without certain behaviors and [Appellant] denied those behaviors," he stated. Asked, then, whether his conclusion was thus based in part on [Appellant]'s denial, Dr. Atkins conceded, "If, in fact, the things that he is accused of are true, then he would have a psychosexual disorder." He did not concede their truth, however, but added, "I found nothing to support that that's the case."

Testifying in rebuttal, Dr. John O'Brien disagreed with Dr. Atkins' diagnosis, and, in response to [Prosecutor] McGettigan's pointed question, opined that the subject letters were also consistent with a psychosexual disorder with a focus on adolescence or preadolescence. He acknowledged, though, that his opinion was

valid only if the facts were as the Commonwealth alleged them to be. "Part of the difficulty is that in doing such an evaluation," he explained, "[Y]ou're considering evidence that hasn't been proven[, s]o it's difficult to draw factual conclusions—impossible to draw factual conclusions from that sort of information."

The expert testimony, therefore, was not as damning as [Appellant] proposes. Neither expert characterized him as a pedophile, and neither actually stated that he had a psychosexual disorder. Dr. Atkins said that would be the case if the facts were as the Commonwealth alleged, which is the same thing Dr. O'Brien indicated. Neither suggested which facts the jury should believe, however. Accordingly, neither suggested that the letters or anything else were in fact indicative of the defendant being a pedophile. On the contrary, both made it clear that the paradigm into which the letters ultimately fit depended on what the factfinder believed about the Commonwealth's allegations. That function, as Judge Cleland made abundantly clear, was reserved to the jury. That being the case, [Attorney] Amendola's decision to call Dr. Atkins did not "open the door" to the expert opinion that his client was a pedophile.

[Attorney] Amendola's decision to call Dr. Atkins, moreover, was reasonably strategic. [Attorney Amendola] was cognizant that calling him created a potential risk but thought it even riskier not to call him. Though he interpreted the letters as "Jerry being Jerry," Amendola recognized that [Appellant]'s behavior seemed "off the wall" to the average citizen. He thus wanted the jury to hear that "pedophile" was not the only reasonable explanation for it, and believed Dr. Atkins could do that without prejudicing his client. Looking back four years later, [Attorney] Amendola said he would not pursue the same course today.

PCRA Ct. Op., 10/18/17, at 47-49.

Appellant argues that Attorney Amendola was ineffective for calling Dr. Atkins as a witness, as he gave "damaging testimony" that opened the door to rebuttal testimony from Dr. O'Brien. Appellant's Brief at 142, 144. Appellant asserts that he was adamantly opposed to presenting Dr. Atkins as a witness and that Attorney Amendola was fully aware of the risk that Dr.

Atkins' testimony would open the door to rebuttal testimony. *Id.* at 139. Appellant contends that Attorney Amendola had no reasonable basis for calling Dr. Atkins to testify, as the letters written to Victim 7 "contained no information that suggested [Appellant] was a pedophile." *Id.* at 143. Appellant avers that the testimony "caused confusion with the jury, as the jury was presented with evidence of a mental infirmity of a sort that would, in theory, explain or excuse the alleged criminal behavior, when [Appellant's] contention was that there was no criminal behavior." *Id.* at 142.

The Commonwealth counters that "given the nature of [Appellant's] interactions with children, the decision to call Dr. Atkins as a witness to explain [Appellant's] conduct was one grounded in reasonable and sound trial strategy." Commonwealth's Brief at 101. The Commonwealth further asserts that Dr. Atkins' testimony was not intended to provide a defense to the charges; rather, it was for a limited purpose, as demonstrated by the trial court's jury instructions. *Id.*

At the PCRA hearing, Attorney Amendola testified that "Dr. Atkins' testimony was restricted to explaining those letters [to Victim 7]. But the bottom punch line was that [Appellant's] behavior, although different, could be explained through histrionics, but it wasn't indicative of someone who was a pedophile." PCRA Hr'g, 8/12/16, at 163. He further testified that, "[a]nd if you're asking me had I to do it over again as a Monday morning quarterback, I would say of course not, obviously not. But we used it to the best that we could because we were faced with the issue that [Appellant's] behaviors over

the years with multiple kids was different than the average person." ***Id.*** at 164-65.

Based on our review, we agree with the PCRA court's conclusions, which are supported by the record. Although Dr. Atkins' testimony opened the door to rebuttal testimony from Dr. O'Brien, Appellant is not entitled to relief. Attorney Amendola articulated a reasonable strategy for calling Dr. Elliot Atkins to testify at trial, in that he wanted to provide the jury with an explanation for Appellant's behavior that did not involve pedophilia. ***See id.*** at 163. Moreover, although Attorney Amendola testified that he would have made a different decision "as a Monday morning quarterback," we do not employ a hindsight analysis in evaluating the reasonableness of counsel's trial strategies. ***See Strickland v. Washington***, 466 U.S. 668, 689 (1984) (stating that "[j]udicial scrutiny of counsel's performance must be highly deferential" and the reasonableness of counsel's decisions cannot be based upon "the distorting effects of hindsight"). Therefore, we agree with the PCRA court's conclusion that Attorney Amendola pursued a reasonable strategy, and could not be found constitutionally ineffective. ***See Stewart***, 84 A.3d at 707.

> **18. Did the [PCRA] court err in finding counsel effective for failing to object to improper opinion testimony by an unqualified expert?**

Appellant claims that counsel was ineffective for failing to object to improper opinion testimony by Clinton County Children and Youth Service (Clinton County CYS) case worker, Jessica Dershem. Appellant's Brief at 262. By way of background to this claim, Clinton County CYS received a referral

from A.F.'s school concerning inappropriate contact between Appellant and A.F. *See* N.T., 6/12/12, at 125. The referral alleged that over a period of years, A.F. and Appellant slept in the same bed and had physical contact with each other over their clothes. *Id.* at 153. Dershem interviewed A.F. on November 20, 2008 and December 12, 2008. During the first interview, A.F. reported that there was physical contact between him and Appellant, but maintained that their clothes were always on. *Id.* at 154. During the second interview, A.F. disclosed that Appellant would blow on his stomach, kiss him on the lips, have him lay on top of Appellant to crack his back, and touch his buttocks underneath his pants.[29] *Id.* at 158-59.

Dershem also interviewed Appellant on January 15, 2009. Appellant admitted that he would blow on A.F.'s stomach, kiss A.F. on the forehead or cheek, wrestle with A.F., and have A.F. lay or stand on him to "crack his back." *Id.* at 170-72. When asked whether if his hands went below A.F.'s pants, Appellant answered that he could not "honestly answer whether or not his hands went below [A.F.'s] pants." *Id.* at 138. However, Appellant denied any sexual contact with A.F. *Id.* at 139.

As the PCRA court further explained:

---

[29] A.F. testified at trial that Appellant engaged in this behavior when he was approximately eleven or twelve years old. *See* N.T., 6/12/12, at 21. When A.F. was twelve, Appellant began performing oral sex on A.F., and later asked A.F. to perform oral sex on him. *Id.* at 23-26. A.F. did not report that Appellant engaged him in oral sex during the interviews with Dershem. *See* N.T., 6/12/12, at 159.

> After Dershem described her initial interview with [A.F.], [Prosecutor] McGettigan asked her to define its purpose. "The interview was . . . to determine whether or not we had enough information to consider it child abuse," she explained, thus prompting the attorney to ask what conclusion she had reached that day. She responded, "[W]e felt that [A.F.] had some more stuff to talk about," adding that she and her coworkers felt after the second interview that they had enough information to conclude that the report alleging that [Appellant] had sexually abused [A.F.] was indicated. McGettigan next asked whether Dershem's initial impression stemmed from a belief that [A.F.] "was lying to you, making something up, or merely withholding and failing to fully disclose," and the caseworker clarified, "Just withholding because he was uncomfortable talking about the incidents."

PCRA Ct. Op., 10/18/17, at 50 (record citations omitted). "During re-direct examination, [Prosecutor] McGettigan twice asked [Dershem] whether, in her 'professional and personal opinion,' what she learned in late 2008 and early 2009 indicated that [Appellant] had fostered an 'inappropriate relationship' with [A.F.]." *Id.* at 49. On both occasions, Dershem responded, "Yes."

Attorney Amendola did not object to the Commonwealth's questions asking whether Dershem believed that Appellant fostered an inappropriate relationship with A.F. or that A.F. was lying during the interviews. At the PCRA evidentiary hearing, Attorney Amendola noted that the Commonwealth was implicitly suggesting Dershem was an expert. Attorney Amendola did not provide a reason for the failure to object.

Appellant argues that although Dershem was presented as a lay witness, the Commonwealth asked her to present opinion testimony on whether an inappropriate relationship existed and whether A.F.'s allegations were

credible. Appellant's Brief at 266. He claims that, had counsel objected, the Commonwealth would not have been permitted to give her "unfounded expert opinion." *Id.* He asserts that counsel had no reasonable basis for failing to object to her testimony, and that as a result, Appellant suffered prejudice. *Id.*

The Commonwealth responds that Dershem was not offering an expert opinion on whether or not A.F. was credible. Commonwealth's Brief at 182. Instead, the Commonwealth asserts that Dershem's testimony was "merely explaining her observations and the background surrounding her report . . . ." *Id.* The Commonwealth concludes that because the prosecution did not elicit improper evidence and did not tell the jury to assign special weight to her testimony based on her skill, knowledge, and experience, Appellant's claim has no basis. *Id.*

Instantly, the PCRA court rejected this claim of ineffectiveness. First, the PCRA court noted that the jury instructions belied Appellant's assertion that the jury could have weighed Dershem's testimony as expert testimony and found sufficient reason to convict him based solely on her opinion that an inappropriate relationship existed. *See* PCRA Ct. Op., 10/18/17, at 49-50. Specifically, the court concluded:

> the [c]ourt would have to assume that the jury disregarded the fact that Judge Cleland identified only Drs. Atkins and O'Brien as experts, and ignored the elements of the criminal offenses with which he was actually charged, as clearly defined by Judge Cleland. It would further have to assume that the jury ignored his careful and lengthy delineation between criminal and non-criminal physical contact:

- 104 -

Now, I will submit that at some point in your deliberations you'll have to confront the question: When does otherwise innocent conduct become criminal? Perhaps I can offer some guidance that might be useful. Let us begin with the obvious proposition that it is not necessarily a crime for an adult to touch a child. It's not a crime, for example, for a downhill skiing racing coach to take hold of a child's leg to demonstrate how to properly position it over a ski or for a wrestling coach, in very close contact with an athlete, to demonstrate a wrestling move or for a teacher to put a comforting arm around a crying child. Now, it is obviously a crime, as I will explain to you, for a man to have oral sex with a boy or for the man to have the boy perform oral sex on him. And if you believe that testimony that it happened in this case, then you may find the defendant guilty.

But other forms of physical contact are more problematic. It's not necessarily a crime, for example, for a man to take a shower with a boy. It's not necessarily [a] crime for a man to wash a boy's hair or to lather his back or shoulders or to engage in back rubbing or back cracking. If you believe the defendant does those things - did those things, it does not necessarily mean that you must find the defendant guilty. You may believe he exercised poor judgment, but poor judgment does not in and of itself amount to criminality. Similarly, an adult's behavior is not a crime simply because the behavior of the adult makes the child feel uncomfortable. A child's reaction may be evidence for you to consider in deciding whether a crime has been committed but it's not determinative. What makes this kind of ambiguous contact a crime is the intent with which it is done. You must distinguish an expression of familiar or family affection from an act of lust. A display of innocent affection is not a crime, but what appears to be otherwise innocent conduct when performed with a sexual motive, when performed with the intent to sexually arose [sic] an adult and to satisfy an adult's sexual desire at the expense of a child, that is a crime.

So the issue is not what the child felt. The issue is what the defendant intended. It is the defendant's intent, not the child's reaction that determines if a crime was committed. Of course, how a child reacted is not irrelevant to the extent it assists you in assessing the defendant's attempt, you may consider.

- 105 -

> If you decide that the defendant engaged in the various behaviors that have been described during the trial, then you must decide which acts, if any, he did with the intention to satisfy his own sexual desires. Any behavior motivated by sexual desire was a crime. If he did not act out of sexual desire, then he committed no crime even if he did display poor judgment.

> Whether or not the jury may have otherwise inferred that Dershem was offering an expert opinion, and whether or not her testimony gave the impression that an "inappropriate relationship" was enough to support a conviction, therefore, Judge Cleland unequivocally corrected any such misapprehension. The law presumes, after all, that a jury follows the judge's instructions. ***Commonwealth v. Hawkins***, 701 A.2d 492, 503 (Pa. 1997). Accordingly, [Appellant] was not prejudiced by Amendola's failure to object to Dershem's "expert" opinions.

***Id.***

> Second, the PCRA court reasoned that

> [i]t is not want of prejudice, however, but want of merit that defeats that portion of [this claim] wherein [Appellant] suggests that Dershem opined on [A.F.]'s credibility.

> After Dershem described her initial interview with [A.F.], [Prosecutor] McGettigan asked her to define its purpose. "The interview was ... to determine whether or not we had enough information to consider it child abuse," she explained, thus prompting the attorney to ask what conclusion she had reached that day. She responded, "[W]e felt that [A.F.] had some more stuff to talk about," adding that she and her coworkers felt after the second interview that they had enough information to conclude that the report alleging that [Appellant] had sexually abused [A.F.] was indicated. McGettigan next asked whether Dershem's initial impression stemmed from a belief that [A.F.] "was lying to you, making something up, or merely withholding and failing to fully disclose," and the caseworker clarified, "Just withholding because he was uncomfortable talking about the incidents."

> In eliciting Dershem's opinion about why [A.F.] did not fully disclose during their first interview, says [Appellant], the Commonwealth violated the prohibition against experts testifying

- 106 -

on the issue of a witness's credibility. *E.g., Commonwealth v. McClure*, 144 A.3d 970, 877 (Pa. Super. 2016). Read in context, though, her comments do not reasonably lend themselves to that interpretation.

When she made the allegedly objectionable observations, Dershem was speaking within the confines of how she had perceived [A.F.]'s conduct at one interview she had facilitated more than three-and-a-half years earlier. She did not stray beyond that: She did not attempt to characterize [A.F.] as generally truthful; to suggest that either he or the larger population of children who had been sexually abused tended not to fully disclose initially; or to intimate that the jury should give credence to his or any of the victims' testimony. In short, there was nothing about Dershem's testimony from which one could reasonably infer that she was opining about [A.F.]'s credibility in 2008 or 2012. Accordingly, [Attorney] Amendola had no basis to object that she was opining on a witness's credibility, whether as an expert or as a layperson.

*Id.* at 49-51.

Based on our review, we agree with the PCRA court's conclusions. Even if Prosecutor McGettigan's questions were intended to elicit improper opinion testimony from Dershem, the jury was not instructed to regard her testimony about Appellant's inappropriate relationship with A.F. as an expert opinion. Moreover, we cannot conclude that Dershem's responses to Prosecutor McGettigan's questions undermined the jury's fair consideration of A.F.'s testimony that Appellant ultimately engaged him in oral sex. Therefore, Attorney Amendola's failure to object to Prosecutor McGettigan's exchanges with Dershem did not result in prejudice. *See Daniels*, 963 A.2d at 419.

**19. Whether the [PCRA] court erred in finding counsel [was] effective in neglecting to object to the trial court's erroneous guilt instruction as part of its character evidence instruction[.]**

Appellant argues that PCRA court erred in rejecting his ineffectiveness claim based on an "instruction that incorrectly told the jury to find [Appellant] guilty even if it was not satisfied beyond a reasonable doubt of [Appellant's] guilt." Appellant's Brief at 133. Appellant asserts that Attorney Amendola could have no reasonable basis for failing to object, and that "[t]he mistake [wa]s more serious because it occurred in the context of an instruction on character evidence and how such evidence is itself sufficient to raise a reasonable doubt." *Id.* Appellant states that character evidence is of paramount importance in a case involving sexual offenses, and he concludes that "improper character witness instruction [wa]s therefore more prejudicial in such cases." *Id.* at 133.

The Commonwealth responds that the inclusion of one erroneous word in the court's otherwise sound charge does not warrant a new trial. Commonwealth's Brief at 92. The Commonwealth asserts that when the instructions are read as a whole, "one would be hard-pressed to conclude that a reasonable juror would be genuinely misled by the erroneous insertion of an incorrect word into an otherwise rudimentary, common-sense tenet. . ." *Id.* at 95.

When reviewing a trial court's jury instructions, we "will look to the instructions as a whole, and not simply isolated portions, to determine if the instructions were improper." *Commonwealth v. Antidormi*, 84 A.3d 736, 754 (Pa. Super. 2014).

Additionally, we note that

- 108 -

[a] jury charge will be deemed erroneous only if the charge as a whole is inadequate, not clear or has a tendency to mislead or confuse, rather than clarify, a material issue. A charge is considered adequate unless the jury was palpably misled by what the trial judge said or there is an omission which is tantamount to fundamental error. Consequently, the trial court has wide discretion in fashioning jury instructions.

**Commonwealth v. Thomas**, 904 A.2d 964, 970 (Pa. Super. 2006) (citations omitted).

Here, the trial court's instructions regarding character evidence were as follows:

Now, the defense has offered evidence tending to prove that the defendant is of good character. I'm speaking of the defense witnesses who testified that the defendant has a good reputation in the community for being law-abiding, peaceable, nonviolent individual.

The law recognizes that a person of good character is not likely to commit a crime that is contrary to that person's nature. Evidence of good character may by itself raise a reasonable doubt of guilt and require a verdict of not guilty.

So you must weigh and consider the evidence of good character along with the other evidence in the case and if on the evidence you have a reasonable doubt of the defendant's guilt, you may find him not guilty.

However, if on all the evidence you are **not** satisfied beyond a reasonable doubt he is guilty, you should find – that he is guilty, you should find him guilty. But in making that determination, you may consider evidence of good character which you believe to be true.

N.T., 6/21/12, at 22 (emphasis added).

The PCRA court acknowledged the specific error in the instruction, but concluded:

> Judge Cleland plainly and repeatedly instructed the jury that it was the Commonwealth alone that had the burden of proving the defendant guilty beyond a reasonable doubt and that the defendant did not have to prove anything in his own defense. That was in addition to several corollary references he had made during the opening charge. It is thus unfathomable that [the trial court's] solitary misstatement left the jurors uncertain about the applicable standard of proof, particularly when he had just finished instructing them that "[e]vidence of good character may by itself raise a reasonable doubt of guilt and require a verdict of not guilty."

PCRA Ct. Op., 10/18/17, at 58.

We agree with the PCRA court's conclusions, which are supported by the record. The trial court repeatedly stated that the Commonwealth had the burden of proving each element of the charged offenses beyond a reasonable doubt. *See* N.T., 6/21/12, at 9-12, 23, 25, 26, 27. When read in the context of the charge as a whole, the jury instructions indicate that it was the Commonwealth's burden to prove Appellant's guilt beyond a reasonable doubt. *See Antidormi*, 84 A.3d at 754. Moreover, there is no indication that the jury was "palpably misled by what the trial judge said." *See Thomas*, 904 A.2d at 970. Accordingly, Appellant's claim that counsel was ineffective does not warrant relief. *See Daniels*, 963 A.2d at 419.

> **20. Did the [PCRA] court err in holding counsel [was] effective in not filing a collateral appeal after the denial of their motion to withdraw?**

Appellant claims that counsel were ineffective for failing to file a collateral appeal from the trial court's order denying their June 5, 2012 motion to withdraw from representation. Appellant's Brief at 209. By way of background, Appellant's trial counsel filed separate motions for continuance

on February 29, April 12, and May 30, 2012, all of which the trial court denied.

Jury selection was scheduled to commence on June 5, 2012.

> With respect to the motion to withdraw, the PCRA court explained:

> On June 5, 2012, trial counsel filed a motion to withdraw as counsel, which they first discussed with Judge Cleland in Chambers. Due to the volume of written discovery materials and the unavailability of witnesses, they felt ill-prepared to defend [Appellant]. Judge Cleland denied the motion, however, and ordered them to proceed. Neither attorney sought to appeal that order as collateral to the matter at hand, and both continued to represent the defendant at jury selection and through trial.

PCRA Ct. Op., 10/18/17, at 18.

> On direct appeal, Appellant challenged the denial of his motions for continuances. When affirming the denial of Appellant's motions for continuance, this Court reasoned:

> Here, from January 28, 2012, until June 15, 2012, [Appellant] received voluminous supplemental discovery. From the Commonwealth he received 9,450 pages of documentation, 674 pages of Grand Jury transcripts, and 2,140 pages from subpoenas *duces tecum*. Due to the high volume of discovery received so close to the trial date, counsel maintained they were unprepared for trial and requested continuances on March 22, 2012, May 9, 2012, and May 25, 2012.

> In orders entered on February 29, 2012, and April 12, 2012, the trial court summarily denied the continuance requests. In an order entered on May 30, 2012, however, the trial court addressed [Appellant's] claim regarding the need to postpone the trial due to the volume of material provided in discovery. The trial court explained its denial as follows:

> > The amount of material that I have ordered the Commonwealth to provide in discovery has been significant. No doubt sorting the wheat from the chaff has been time consuming. Again, however, the defense team is assuredly capable, even as the trial is ongoing, of sorting through the

- 111 -

material to determine what is useful to the defense and what is not.

* * *

While I certainly do not doubt the sincerity of defense counsel in requesting a continuance, the reality of our system of justice is that no date for trial is ever perfect, but some dates are better than others. While June 5th does present its problems, on balance and considering all the interests involved—the defendant's right to a fair trial, the alleged victims' right their day in court [sic], the Commonwealth's obligation to prosecute promptly, and the public's expectation that justice will be timely done—no date will necessarily present a better alternative.

The trial court's explanation denotes a careful consideration of the matter. The decision does not reflect a myopic insistence upon expeditiousness in the face of [Appellant]'s request; it was not an arbitrary denial. Therefore, we can find no constitutional error, nor abuse of discretion, in the denial of the continuance requests.

Assuming for the sake of argument, however, that the trial court did commit an error in denying the continuance requests, we would find the error harmless.

*Sandusky*, 77 A.3d at 672 (citations and footnote omitted). This Court proceeded to conclude that there was evidence that the denial of the continuances did not alter trial counsel's conduct at trial and thus did not result in prejudice. *Id.* at 673. Appellant, however, did not challenge the denial of trial counsels' motion to withdraw in his direct appeal.

Appellant now argues that trial counsel should have immediately appealed the order denying the motion to withdraw as a collateral order. When asserting that there was a reasonable possibility that this Court would have granted relief on the merits of such an appeal, Appellant suggests:

> The critical question is whether there is a reasonable probability that counsel would have been permitted to withdraw by the Superior Court since the appellate court would have been confronted with attorneys arguing, in good faith, that they could not adequately represent their client.
>
> [Attorney] Amendola himself acknowledged that he was not able to adequately prepare and present his defense and testified to that effect during his PCRA testimony. [Appellant's] additional claims demonstrate that [Attorney] Amendola was unable to effectively represent [Appellant]. [Attorney] Amendola already made a record-based statement that he could not effectively represent [Appellant]. Had [Attorney] Amendola appealed, there is a reasonable probability that he would have been permitted to withdraw where the case was not yet a year old at the time (it was only seven months from the filing of the first information to the start of trial), he had not been granted serial continuances, the case was highly complex involving eight accusers and ten alleged victims with over forty charges, and in excess of 12,000 pages of discovery.
>
> [Attorney] Amendola did not completely review the discovery in this case. He did not review Matt Sandusky's grand jury testimony nor does it appear he was aware of the interview relative to Calhoun until after trial. Given counsels' own admissions that they could not provide constitutionally effective counsel and would be proceeding in violation of the canons of ethics, there is a reasonable probability that the appellate court would have permitted trial counsel to withdraw from the case.

*Id.* at 212-13.

The Commonwealth argues that even if Appellant could satisfy the requirements of the collateral order doctrine, there is no reasonable probability that an appellate court would have determined that Judge Cleland abused his discretion in denying trial counsels' motion to withdraw based on their need for additional time. Commonwealth's Brief at 150. The Commonwealth notes that the same reasoning was rejected by the trial court on three prior occasions, and that the Pennsylvania Supreme Court denied the

motion for extraordinary relief and motion for stay in order to delay the trial. Both motions were denied the day before submission of the motion to withdraw. *Id.*

As this Court noted in ***Commonwealth v. Magee***, 177 A.3d 315, 322-23 (Pa. Super. 2017),

> a trial court's denial of counsel's petition to withdraw under the abuse of discretion standard.

> ***

The Rules of Criminal Procedure provide that an attorney for a defendant may not withdraw without leave of court. Pa.R.Crim.P. 120(B)(1). A comment to the rule explains:

> The court must make a determination of the status of a case before permitting counsel to withdraw. Although there are many factors considered by the court in determining whether there is good cause to permit the withdrawal of counsel, when granting leave, the court should determine whether new counsel will be stepping in or the defendant is proceeding without counsel, and that the change in attorneys will not delay the proceedings or prejudice the defendant, particularly concerning time limits. In addition, case law suggests other factors the court should consider, such as whether (1) the defendant has failed to meet his or her financial obligations to pay for the attorney's services and (2) there is a written contractual agreement between counsel and the defendant terminating representation at a specified stage in the proceedings such as sentencing . . . .

Pa.R.Crim.P. 120, Cmt. This Court has stated:

> No brightline rules exist to determine whether a trial court has abused its discretion in denying a Petition to Withdraw as counsel. A balancing test must be utilized to weigh the interests of the client in a fair adjudication and the Commonwealth in the efficient administration of justice. Thus, a resolution of the problem turns upon a case by case

analysis with particular attention to the reasons given by the trial court at the time the request for withdrawal is denied.

***Magee***, 177 A.3d at 322-23 (some citations and footnote omitted).

Based on our review, we conclude that Appellant failed to establish a reasonable possibility that this Court would have granted relief on the merits of trial counsels' petition to withdraw. Appellant's suggested arguments for appealing from the denial of his petition to withdraw would have been substantially similar to the arguments raised in the denial of his motions for continuances. As noted by this Court in relation to the denial of his continuances, the trial court's balancing of the relevant factors did not indicate an abuse of discretion. ***See Sandusky***, 77 A.3d at 672. Furthermore, as noted above, Appellant has failed to establish that Attorney Amendola and Attorney Rominger provided inadequate representation at trial. ***See Commonwealth v. Spotz***, 84 A.3d 294, 315 (Pa. 2014). Therefore, we discern no basis to disturb the PCRA court's rejection of this claim.

> **21. Did the [PCRA] court err where the cumulative errors in this matter were so significant that they deprived [Appellant] of a fair trial in violation of his due process rights and his state and federal constitutional right to a fair trial?**

Appellant claims that the cumulative errors in his case were so significant that he was deprived of a fair trial. Appellant's Brief at 267. He asserts that all of his appellate issues have arguable merit and that, therefore, he is entitled to a new trial. ***Id.***

The Pennsylvania Supreme Court has stated:

We have often held that "no number of failed [ ] claims may collectively warrant relief if they fail to do so individually." However, we have clarified that this principle applies to claims that fail because of lack of merit or arguable merit. When the failure of individual claims is grounded in lack of prejudice, then the cumulative prejudice from those individual claims may properly be assessed.

*Spotz*, 84 A.3d at 321 n.22 (citations omitted).

Appellant's passing reference to cumulative error, however, does not establish any error in the PCRA court's analysis of this issue. *See* PCRA Ct. Op., 10/18/17, at 58-59. In any event, although several of Appellant's individual claims failed for lack of prejudice, we agree with the PCRA court that the combined effect of the errors did not deprive Appellant of a fair trial. *See Spotz*, 84 A.3d at 321.

### 22. Is [Appellant] entitled to be re-sentenced as he was illegally sentenced based on unconstitutional mandatory minimum sentences?

In his final issue, Appellant challenges the legality of his sentence. Appellant's Brief at 268. Specifically, he argues that the trial court's imposition of mandatory minimum sentences under Section 9718 violated *Alleyne v. United States*, 570 U.S. 99 (2013) and *Commonwealth v. Wolfe*, 140 A.3d 651 (Pa. 2016). Appellant's Brief at 268. Appellant concedes that he did not raise this issue in the PCRA court, but asserts that he is entitled to relief in light of *Commonwealth v. DiMatteo*, 177 A.3d 182, 192 (Pa. 2018). Appellant's Brief at 269.

The Commonwealth concedes that Appellant's aggregate sentences relied on mandatory minimum sentencing provisions. The Commonwealth,

however, suggests that a remand is unnecessary. Commonwealth's Brief at 184-85. Instead, the Commonwealth requests that this Court "effectuate the intent of the trial court by preserving the overall sentencing structure but removing the mandatory designations currently affixed to the counts" where the mandatory sentences were imposed. **Id.**

Initially, we note that a challenge to the applicability of a mandatory sentencing provision such as former Section 9718(a) goes to the legality of the sentence. **See Commonwealth v. Shiffler**, 879 A.2d 185, 188-89 (Pa. 2005) (explaining that a challenge to the applicability of Section 9714 raises question of statutory construction, which is a pure question of law implicating legality of sentence). In **Alleyne**, the Supreme Court held that any fact that increases the sentence for a given crime must be submitted to the jury and found beyond a reasonable doubt. **Alleyne**, 570 U.S. 99. The Supreme Court reasoned that a Sixth Amendment violation occurs where such facts are not submitted to a jury. **Id.** at 104. In **Wolfe**, our Supreme Court, relying on **Alleyne**, held that 42 Pa.C.S. § 9718(a) "is irremediably unconstitutional on its face, non-severable, and void."[30] **Wolfe**, 140 A.3d at 63.

Instantly, **Alleyne** was decided before Appellant's direct appeal became final and the instant PCRA petition was timely filed. **See DiMatteo**, 177 A.3d

---

[30] The version of Section 9718(a) in effect between 1995 and 2006 imposed a five-year mandatory minimum sentence for a person convicted of IDSI when the victim was less than sixteen years of age. **See** 42 Pa.C.S. § 9718(1) (eff. 1995). In 2006, the General Assembly increased the mandatory minimum sentence from five to ten years. **See** 42 Pa.C.S. § 9718(1) (eff. 2006).

at 192. Therefore, Appellant is entitled to application of **Alleyne**, notwithstanding his failure to raise this claim in the PCRA court. **See id.** Therefore, we agree with the parties that pursuant to the holdings in **Alleyne** and **Wolfe**, the imposition of mandatory minimum sentences was illegal. Therefore, Appellant is entitled to a remand for re-sentencing without application of any unlawful mandatory minimum sentences.

We acknowledge that the trial court explained that the sentence was "structured as a whole" and that

> [t]here is no significance, therefore, to the fact that the sentences on some counts are either concurrent with or consecutive to sentences imposed on other counts. The fact that some sentences are concurrent or consecutive to other sentences on other counts is not any indication that I necessarily believe any one crime is more or less serious than any other crime or that the offenses against one person are any more or less deserving of punishment than the offenses against any other person. I have simply tried to simplify an otherwise complex sentencing structure into a more easily understood format.

N.T., 10/9/12, at 49. However, we discern no authority for the Commonwealth's suggestion that we may simply strip the trial court's sentence of the mandatory minimum designation.

Accordingly, we affirm that part of the PCRA court's order denying a new trial, but we vacate the judgment of sentence in its entirety and remand for re-sentencing without imposition of mandatory minimum terms. **See Commonwealth v. Bartrug**, 732 A.2d 1287, 1289 (Pa. Super. 1999) (holding sentencing error in multi-count case normally requires appellate court

to vacate entire judgment of sentence so trial court can restructure its sentencing plan on remand), *appeal denied*, 747 A.2d 896 (Pa. 1999).

Order affirmed in part. Judgment of sentence vacated in part. Case remanded for re-sentencing. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 02/05/2019